## NATIONAL WATERWORKS CO. v. KANSAS CITY.

## KANSAS CITY v. NATIONAL WATERWORKS CO.

### (Circuit Court, W. D. Missouri, W. D. February 12, 1895.)

#### Nos. 1783, 1828.

1. LICENSE—ESTOPPEL.

The M. Ry. Co. permitted a waterworks company to construct a pipe line along the right of way to which the railway company had title in fee With the full knowledge of the railway company, the waterworks company expended considerable sums in the construction of such pipe line, and continued, without interference, to use the same for a number of years in supplying a large city with water. *Held,* that the railway company would be estopped to revoke the license thus acted upon.

2. STATUTES—CONSTRUCTION—SEPARATE MATTERS IN SAME ACT.

The city of K. passed an ordinance permitting the N. Waterworks Co., in consideration of $10,000, to lay and maintain pipes under the streets of said city for the purpose of conveying water to another city. No limitation of time was expressed. The $10,000 was paid, and the pipes laid. The ordinance was passed under the authority of an act of the legislature. The third section of such act gave power to the city to grant the right to construct and maintain waterworks for such city, and the right to construct and maintain pipes under the streets for conveying water to other cities. The fourth section enacted that no grant, under the third section, should continue more than 20 years, and that any such grant

might be revoked at any time after 10 years, and then provided that the city might acquire title to the waterworks property, and established a full system of procedure for such acquisition of title. *Held*, that the third section of such act contemplated two distinct matters,—construction of waterworks in the city, and laying pipes across the city; that the fourth section related only to the former, and put no limit upon the duration of grants under the latter; and, accordingly, that the grant to the N. Waterworks Co., accepted and acted on by it, could not be revoked.

3. TITLE TO REAL ESTATE—EQUITABLE LIEN.
    The N. Waterworks Co. was directed by a decree to convey to the city of K., in pursuance of a contract with such city, a clear title to its waterworks system, which included a supply station to which the company had the legal title, but from which it was supplying the city of C. with water under a contract for continuous supply. *Held*, that a conveyance of the legal title would not be accepted as a compliance with the decree, unless security were given by the company for the supply of the city of C. from independent sources.

4. SATISFACTION OF LIENS UNDER DECREE—PRACTICE.
    The property to be conveyed by the waterworks company was incumbered with certain liens, to the discharge of which the city of K. was entitled to have the purchase money applied. There was a difference between the holders of such liens as to the amounts, respectively, applicable thereto out of such purchase money. *Held*, that the city would not be required to pay the purchase money, without protection from possible claims of lienholders; and, for that purpose, a commissioner would be appointed by the court to act with the agent of the waterworks company and the lienholders in receiving the money, and to see that proper releases were given to the city.

This was a suit by the National Waterworks Company of New York against the city of Kansas City, Mo., to enforce a contract for the construction and operation of a system of waterworks, and the purchase thereof by the city. The city filed a cross bill seeking to be relieved from the contract. A decree for performance of the contract was entered by the circuit court, and, on appeal to the circuit court of appeals, was modified, and affirmed as modified. 10 C. C. A. 653, 62 Fed. 853. Upon the filing of conveyances of the waterworks system, as directed in the decree, the city filed exceptions to their sufficiency, pursuant to leave reserved in such decree.

Louis C. Krauthoff, C. O. Tichenor, and Gardiner Lathrop, for National Waterworks Co.

John C. Gage, L. C. Slavens, O. H. Dean, F. F. Rozzelle, and Frank Hagerman, for Kansas City.

Before BREWER, Circuit Justice, and PHILIPS, District Judge.

BREWER, Circuit Justice. At the May term, 1894, of the court of appeals for this circuit, a decree was ordered to be entered in this case, by which, among other things, the National Waterworks Company was directed to execute and place in escrow with the clerk of this court, on or before December 1, 1894, good and sufficient deeds, assignments, releases, bills of sale, and other conveyances for the transfer to the city of Kansas City of the whole and complete waterworks system belonging to such company, including that portion thereof which is situated in the state of Kansas; and that within 30 days thereafter the city should file any exceptions it might have to the sufficiency of such conveyances. This decree was in obe-

dience to the mandate of that court duly entered in this court, and on the day named, to wit, the 1st day of December, 1894, the water-works company delivered to the clerk certain deeds and releases, which deeds and releases it claims constitute a full compliance with the terms of the decree against it. Within the 30 days the city filed exceptions, and the question now submitted to us for consideration arises upon these exceptions.

A brief general statement of the condition of the waterworks plant will help to a clear understanding of the exceptions. The distributing system is in Missouri, and the legal title to this is in the National Waterworks Company. The supply works and a long flow line are in Kansas, and the legal title to them is in the Metropolitan Water Company. Upon the Missouri property are two mortgages or trust deeds of $1,500,000 each. Upon the Kansas property are also two mortgages or trust deeds, one for $900,000, and the other for $2,000,000, which by the terms of the decree were to be fully released. The exceptions of the city run both to the deeds and the releases. It will be convenient to consider these separately.

And, first, as to the matter of title, we do not understand that any objection is made to the form of the conveyances, or doubt entertained that whatever of title is in the grantors is conveyed by the deeds, but the objection is that the grantors, especially the Kansas corporation, have not a perfect title to the property they attempt to convey. The exceptions to the title are as follows: First, that so much of the flow line as passes through the "Fowler Tract," as it is known, is subject to an obligation for the supply of water as a condition of the title received by the company from the owners of that tract; second, that the flow line, for a distance of about two miles from the Quindaro supply station southward, is on the Missouri Pacific right of way, and there simply by permission of the railway company,—a permission subject to revocation at any time, at the mere will of such company; and, third, that the Quindaro supply station and the flow line through the city of Kansas City, Kan., are so subject to the rights and powers of this latter city that it is impossible for the Metropolitan Water Company to vest in the city of Kansas City, Mo., a perfect, unincumbered, and permanent title thereto.

With reference to the first of these, it is understood that the company has obviated the objection by constructing a new flow line which does not pass through the Fowler tract, and so is not burdened by any conditions in the conveyance thereof.

As to the second, it is true that there is no deed or other writing from the Missouri Pacific Railway Company vesting in the water company a right, either temporary or permanent, to use the right of way for its flow line. But the testimony shows that the railway company has a fee-simple title to its right of way; that the water company had permission from the division superintendent of the Missouri Pacific Railway Company to construct its flow line thereon; that the railway company, under contract with the water company, carried the pipes and distributed them on such right of way; and that, in the year 1887, the water com-

pany, at considerable expense, dug a ditch and constructed the flow line along the tracks, and upon the right of way, thus establishing a connection between the supply station at Quindaro and the distributive system in the city of Kansas City, Mo. This work of construction was not done secretly or hastily, but publicly, and under such circumstances as to charge upon the railway company full knowledge thereof. No challenge of its occupation and use of the right of way has been made by the railway company during these intervening years. These facts establish a parol license so far executed as to vest in the water company a right of occupancy and use. I do not regard the permission given by the division superintendent as a contract binding on the railway company, but as one circumstance, with others, showing a knowledge by the company of what was being done on the right of way. The rule is recognized in this state, as elsewhere, that where one party enters upon the real estate of another under a parol license from the latter, and at large expense constructs an improvement which is necessary for the successful carrying on of the business of the licensee, the licensor is estopped to deny the right of the licensee to continue such occupancy and use so long as the necessities of his business require. Among other authorities, are the following: House v. Montgomery, 19 Mo. App. 170; Baker v. Railroad Co., 57 Mo. 265; Chiles v. Wallace, 83 Mo. 84; Le Fevre v. Le Fevre, 4 Serg. & R. 241; Rerick v. Kern, 14 Serg. & R. 267; Campbell v. Railroad Co., 110 Ind. 490, 11 N. E. 482; Wilson v. Chalfant, 15 Ohio, 248; Clark v. Glidden, 60 Vt. 702, 15 Atl. 358; Brewing Co. v. Morton, 47 N. J. Eq. 158, 20 Atl. 286; Duke of Devonshire v. Eglin, 14 Beav. 530. In Rerick v. Kern, 2 Am. Lead. Cas. (5th Ed.) 569, Messrs. Hare & Wallace, after reviewing the authorities, say:

"From the cases which have been cited, we may deduce two things: * * * A license cannot be revoked or withdrawn so long as it is essential to the possession or enjoyment of a vested right or interest, which has been created by the licensor, or placed, with his assent, in a situation where the continuance of the license is essential to its enjoyment. These inferences obviously result from the general rule that no one can recall a promise or declaration made with a view to influence the course of another after he has acted upon it, and thus placed himself in a position where he must necessarily suffer if it be withdrawn. An equitable estoppel arises, under these circumstances, to prevent the legal title from being used as a means of injustice."

The case in 47 N. J. Eq. 158, 20 Atl. 286, is in point, and the facts and rulings thereon are thus stated in the syllabus:

"(1) When a license has been so far executed that its revocation would work a fraud, actual or constructive, upon the licensee, equity will restrain such revocation, although its continuation results in an easement upon the lands of the licensor in favor of the lands of the licensee.

"(2) No distinction in equity arises out of the place where the works are erected under license, whether upon the lands of the licensor or licensee.

"(3) The owner of a brewery constructed, at considerable expense, a drain from the cellar of the brewery along the line of a neighbor's lot, by his consent, and connected it with a public sewer in a street upon which the brewery lot did not face, and maintained it for thirty years. No particular time was fixed for the continuance of the drain. Its continuance was of great consequence to the brewery, and worked little or no injury to the neighbor's lot. Held, that the presumption, from the circumstances, was that it was to con-

tinue as long as the necessity of the brewery required it, and that the owner of the adjoining lot should be restrained from disturbing it so long as the brewery lot was used for a brewery, or until a public sewer should be constructed in the adjoining street."

The case in 14 Beav., supra, is also very significant. In that case it appeared that the town of Grassington was much inconvenienced by the want of a supply of water, and it was discovered that a supply might be obtained by conveying it through certain lands, among them the land of the defendant, and it was charged that he consented that pipes therefor might be laid through his land. In his answer the defendant admitted that he had consented to the passage of the water through his land, but claimed that it was only upon consideration of his being paid a proper and reasonable price therefor, and alleged that no such price had been paid or agreed upon. There was evidence to show that he, without objection, saw the work in progress, and simply said to the workmen: "Take care that you don't stop up my drains in cutting through them, for, if you do, I shall tear up your water course." The works were completed, and used for a period of nearly 10 years, without any dispute or contest on his part; and it was held that he could not prevent the enjoyment of the right of passage, though entitled to payment of a proper consideration therefor, and the matter was referred to a master to ascertain what should be paid. Other authorities might be cited, but these are sufficient to show the course of decision.

There is nothing technical or arbitrary in the rule thus laid down, but it is founded on obvious principles of right and justice. It would be intolerable to permit the railway company, after assenting to the construction of this flow line at such expense,—a flow line by which supply works were connected with the distributive system of a large city,—and also assenting to the use of its right of way for such purpose for a number of years, to withdraw its assent, and break the connection so necessary for the successful operation of the waterworks system. As acts speak louder than words, so conduct is equally potent with writing, and the conduct of the railway company has been such that a court of equity would unhesitatingly say that it is estopped from asserting that it had failed to grant in the proper manner the right to such use of the right of way. These considerations apply with equal force to the objection that no proper grant in writing was made either by this railway company or the Union Pacific Railway Company of a right to place the water pipes underneath their tracks at other points, nearer to the distributive system. This exception, therefore, must be overruled.

The other exception embraces two matters: First, the permanence of the right to use the streets and alleys of Kansas City, Kan., for a flow line; and, second, the interests of Kansas City, Kan., in the supply station at Quindaro.

With reference to the first, it appears that on November 17, 1891, the city council of Kansas City, Kan., passed an ordinance, the first section of which is as follows:

"Section 1. That for and in consideration of the sum of ten thousand (10,-000.00) dollars to it paid, the city of Kansas City, Kan., does hereby sell, and

transfer to the National Waterworks Company of New York, its successors and assigns, whether such successors and assigns be a natural person or a municipal corporation, located in this or any other state, the right to lay and maintain water mains under or over any stream and along, upon and across the streets, alleys and other public grounds of the city of Kansas City, for the purpose of conveying water to any city in this state or any other state; and there is also sold and contracted to said National Waterworks Company of New York, its successors and assigns, aforesaid, the right to maintain any and all water mains heretofore laid under, along, upon and across any such streets, alleys, and other public grounds."

The ordinance was accepted, and the $10,000 paid. There is no limitation expressed as to the matter of time, and the language imports permanence of right, for it is "to lay and maintain."

It is contended, however, that whatever may be the scope of the ordinance, standing by itself, the act of the legislature under which it was passed (Laws Kan. 1891, p. 126) reserves to the city a right to terminate such use of the streets, alleys, and public grounds. Section 3 of the act reads as follows:

"Sec. 3. The mayor and council of such city may grant any person, company or corporation the right to construct, maintain and operate water works, and lay pipes within such city, for the conveyance of water for the use of such city and its inhabitants, as well as to contract with any person, company or corporation to furnish water for such purposes, and *may contract with or grant to any person, company or corporation the right to lay and maintain water mains under, along, upon and across the streets and alleys and other public grounds of such city for the purpose of conveying water to any city in this state or any other state.* And in case the mayor and council shall grant or shall have heretofore granted to any person, company or corporation the right to construct and maintain water works for the use and benefit of the city, shall contract or have heretofore contracted with any person, company or corporation to furnish water for such purposes, the mayor and council shall have the power to levy annually on all the property of said city, taxable according to law, a tax in addition to other taxes, not to exceed two mills on the dollar in any one year for that purpose, and to pay said person, company or corporation in full for such year for water furnished to such city."

Obviously this section contemplates two distinct matters: One, the construction of waterworks and the laying of pipes within the city for the supply of the city; and the other, that expressed in the clause in italics,—the laying and maintaining of water mains for the purpose of conveying water to a city in another state. The one is for the benefit of the city itself, while the other is for the accommodation of a city in another state. Each is independent of the other. The considerations justifying and the limitations appropriate to the one have no application to the other. They would naturally be placed in separate sections, if not in separate acts. Indeed, it is stated that the section was made out of two bills, consolidated in the course of passage through the legislature. The grant of power in this section is general, and without limitation. If this were the only section bearing on the matter, it would be beyond question that the city had the power to make a permanent contract for the use of its streets. But it is insisted that section 4 imposes a limitation, and a hasty reading gives countenance to such contention. The section commences in this way:

"No grant or contract provided for in the preceding section shall continue for a longer period than twenty years; and any such grant or contract may be

terminated at any time after the expiration of ten years from the making of the same, or such less time as may be fixed at the time of making such grant or contract; and the city may acquire title to the waterworks property, and all the rights, privileges and franchises thereto pertaining in the manner following: The city may, at any time after the expiration of ten years, from the making of such grant or contract, or after the expiration of such less time as may be stipulated in the franchise or contract, file a petition in the district court of the county in which such city is situated against the owner or owners of such waterworks and all others interested therein, which petition shall contain a general description of the waterworks property, praying that the city may be permitted to acquire title thereto in the manner provided for in this act."

Then follow provisions for notice, hearing, appraisement, and other proceedings, culminating in a deposit by the city of the amount of the award with the treasurer of the county, for the use of the owners or others interested in said works; and after them these words:

"From the time of the making of such deposit with the county treasurer, the city shall be the absolute owner of the entire waterworks property, and all rights, franchises, and privileges thereunto pertaining, free and clear of the claims of all persons theretofore interested therein."

Now, while the first clause in this section, which reads, "no grant or contract provided for in the preceding section shall continue for a longer period than twenty years," is broad enough to include, not merely grants and contracts for the construction of waterworks and the supply of the city with water, but also contracts for laying and maintaining water mains for the purpose of conveying water to a city in another state, yet, on careful examination, it will become very clear that such breadth of meaning is limited by the subsequent language of the section. The clause just quoted does not stand as an independent and separate provision, but is connected by the copulative conjunction "and" with succeeding provisions, and, as thus connected, must apply to the same subject-matter. Hence it is that grants and contracts, whose duration is limited, are those for the construction of waterworks and the laying of pipes to supply the city with water. The whole section contemplates but one thing, and that is the acquisition by the city of its water-supply system, and it would be resting upon the letter to hold that such single clause, by reason of its general words, includes other matters and other contracts than those within the scope of the balance of the section. It is familiar law that a thing may be within the letter of the statute, and yet not within the statute, because not within its spirit, nor within the intention of its makers. See Church of Holy Trinity v. U. S., 143 U. S. 457, 12 Sup. Ct. 511, and cases cited in the opinion.

It is unnecessary to rest upon the history of the passage of this act through the two houses of the Kansas legislature. It is enough to compare the two sections. While section 3 includes two distinct matters, section 4 treats of but one. All its sentences and parts of sentences must be taken as a declaration of the will of the legislature in respect to that matter. It must undoubtedly be so construed as to completely effectuate the manifest purpose of the law-making body, but to carry its operation further would be, not the upholding of a statute, but in reality the enactment of a law,—

judicial legislation. Obviously the legislature ·thought it wise to reserve to the city the right to acquire its own water-supply system, but it would be ungracious to hold that it meant to give to the city the power to break up the water-supply system of another city in a neighboring state. Of what profit can it be to a city in Kansas to injure a city in Missouri, and what will justify an imputation of an intent on the part of the legislature of Kansas to empower any of its cities to do such an injury? While, of course, the city council could not, by its own action, enlarge the powers given it by the legislature, yet the ordinance which it enacted shortly after the passage of this act may be considered in the light of a cotemporaneous construction of its scope and meaning. I am clearly of the opinion that the ordinance is within the power given by the act, and secures to the company and its assigns a permanent right.

With reference to the other matter, it appears that in the first instance the supply station for Kansas City, Kan., was near the mouth of Jersey creek; that afterwards the same interest, controlling the waterworks system of Kansas City, Kan., and Kansas City, Mo., constructed a supply station at Quindaro, from which alone the two cities have been supplied. The legal title to this property is in the Metropolitan Water Company, and unquestionably its deed conveys such legal title to the grantee named therein, Kansas City, Mo. The claim is that, the title being in a Kansas corporation, and the works having been constructed as a part of the waterworks system, and with the view of supplying Kansas City, Kan., with water, the property is held by the corporation subject to the duty of continuing such supply, and therefore that the conveyance of the legal title to Kansas City, Mo., conveys property burdened with a perpetual use, and is not a compliance with the decree of the court, which provided that it should receive its waterworks system free of all incumbrances. It is claimed, on the other hand, that the Jersey Creek supply station is adequate for the present needs of Kansas City, Kan.; that the distributive system of that city can be connected with it, and without any trouble wholly separated from the main flow line connecting the Quindaro supply station with the distributive system of Kansas City, Mo.; and that then all claims of rights of Kansas City, Kan., to the Quindaro supply station, or any use or benefit thereof, will be gone. While such separation can undoubtedly be made, and easily made, yet I am not satisfied that the claim as to the sufficiency of the supply station at Jersey creek can be sustained. The right of Kansas City, Kan., it is true, is not to have the present Quindaro works permanently used for its benefit, but its right is, as against the water company, to compel the latter to have somewhere an equally satisfactory supply station. There is in none of the ordinances of or contracts entered into between Kansas City, Kan., or any of the cities which were consolidated into it, and the waterworks company, or its predecessors, anything that subjects the particular supply station at Quindaro to the uses of Kansas City, Kan. Hence, the waterworks company can convey to Kansas City, Mo., a full, legal, and unincumbered title to that supply station, provided it

shall secure to Kansas City, Kan., another supply station adequate to the needs of that city. The waterworks company represents that it has purchased ground near its present station at Quindaro, and a right of way therefrom, and that it can, if required, construct both such needed supply station and a flow line therefrom to Kansas City, Kan. It says it has not done so because of the complications attending this litigation and the uncertainty as to its result. Giving to this excuse all the weight to which it can reasonably be entitled, it does not relieve the situation from the fact that Kansas City, Kan., has for the present, at least, an equitable claim upon the Quindaro station for the supply of water to its uses. Still, I think it is sufficient to justify the court, inasmuch as the legal title passes by the conveyance from the waterworks to Kansas City, Mo., in overruling the exception, on condition that satisfactory security is given for the construction of a proper supply station for the wants of Kansas City, Kan., but only upon condition that such security is given. Since the argument made on these exceptions, I have received a brief from the waterworks company suggesting two or three ways in which adequate security can be given for compliance with such condition. I do not know whether the city has fully considered the suggestions in such brief, and the various plans mentioned therein were not discussed in the argument; so I do not think that at present I ought to pass upon the sufficiency of either of the plans suggested. All that I am at liberty now to decide is that the exceptions must be sustained, unless there is provided by the waterworks company security satisfactory to the city, or, if objected to, approved by the court, that within such reasonable time as may be agreed upon or fixed the waterworks company shall provide a supply station and a flow line connecting it with the distributive system of Kansas City, Kan., which shall be fully adequate to the needs of that city. Thus much I decide as a judge.

May I be pardoned if I stop in the course of this opinion, and speaking, not as a judge, but as a friend, say that it seems to me here is a contingency in which the three parties interested, to wit, Kansas City, Mo., Kansas City, Kan., and the waterworks company, ought to enter into a mutual agreement obviating the present construction of such second supply station. According to the testimony, which is not questioned, the present supply station is adequate for the wants of half a million of people,—more, probably, than will be gathered about the mouth of the Kaw for the next quarter of a century. The construction of a second supply station is therefore, for the present, an unnecessary expense. If the three parties mentioned should enter into an arrangement by which the present works could be used for the supply of both cities; Kansas City, Mo., owning the supply station, would receive some compensation for supplying Kansas City, Kan., and in this way make an addition to its revenues. Kansas City, Kan., would receive, as at present, and without additional cost, its full supply of water, and at the same time if, during the life of its contract with the waterworks company, it should decide to purchase the waterworks plant, would have less money to pay, because there would be less of prop-

erty to purchase than if a new supply works were now to be constructed; while the waterworks company, in lieu of adding to its indebtedness by the cost of the new works, would simply make an annual payment out of its revenues for the water by it received from this station for the supply of Kansas City, Kan. I speak of this simply as a friend to the parties, and, although I am conscious that no little irritation and feeling have grown up between Kansas City and the waterworks company out of the present litigation, I cannot but think that a little reflection on the part of all will convince that some such arrangement is beneficial to all, and should be entered into.

Having said this much, I return and reiterate the proposition which, as a judge, I decide, that if no arrangement of this kind is made (and no court can compel parties to make a contract), the waterworks company must give satisfactory security for the construction of a second supply station for the benefit of Kansas City, Kan., or this exception to the title will have to be sustained.

I come now to the exceptions running to the matter of incumbrances. When the deposit of the title papers was made, an order was entered by this court that the $3,000,000, the purchase price, and also the hydrant rentals, should, when paid to the clerk of this court, be forthwith transmitted to the Central Trust Company of New York. The thought was that it was entirely immaterial to the city what arrangement was made between the holders of the incumbrances, and, if they had agreed among themselves that the money should be put in the custody of the Central Trust Company for distribution, that was sufficient. A motion was immediately made by the city for a modification of this order, and on December 17th it was modified so as to direct—First, the payment to the Farmers' Loan & Trust Company, the trustee in the first mortgage or deed of trust, on the Missouri Property, of a sum sufficient to discharge the principal and accrued interest thereof; and, secondly, the payment of the balance to the Central Trust Company, with a reservation of the right and power, upon an objection by intervention of any creditor of the waterworks company, to withhold from the operation of the order a sum sufficient to provide for the payment of such creditor. On the argument of these exceptions, it was stated that some of the later bondholders do not agree to the arrangement which has been attempted to be made, and an intervening petition was presented in behalf of one of them.

It is undoubtedly true that it is a matter of no concern to Kansas City how the money which it pays is distributed among the various lien holders, if the liens on the property are discharged; but it is important to the city that those liens should be legally and fully discharged, and that it should not in the future be subjected to the defense of suits brought by various bondholders, claiming that their bonds have not been paid, and that they still remain liens upon the waterworks property. And it ought not to be compelled to trust to a third party, with whom it has no dealings, and over whose conduct it has no control, and whose right to enter satisfaction of the liens is not at the time, and under the circumstances of payment,

beyond question, to distribute the money which it pays among the lien holders in such a manner as to relieve the city and the property from further liability. The city is justified in insisting that the court shall see that the money it pays is so applied as to remove all outstanding liens upon the property. As the first mortgage or trust deed—that to the Farmers' Loan & Trust Company—is by its terms now due and payable, as it is entitled to be paid in full, and the trustee is authorized on behalf of the bondholders to receive payment and enter satisfaction, I see no objection to the first part of the modified order of December 17th,—that part which directs the payment to such Loan & Trust Company of the full amount of the principal and interest. The order should, however, provide that the payment be made upon the receipt of a satisfaction piece, fully releasing and discharging the property from the lien of such a mortgage or deed of trust. When the trustee shall have executed such a release, and received payment of the principal and interest, the bondholders can have no further recourse against the property, but must look to the trustee for the moneys which by the terms of the contract are payable to it for them. With regard to the latter part of the modified order, I am of opinion, as I intimated on the argument, that some additional provision should be made for the protection of the city. The balance of the money payable by the city is not sufficient to pay off the other liens in full; there has to be some scaling of claims. If all of the subsequent lien holders had entered into an agreement in respect to the amounts they are to receive, and the party to whom the money should be paid, it might be sufficient to direct simply the payment to such party; but in view of the fact that, as at present advised, all have not entered into any agreement, I am of opinion that the latter part of the order should be further modified, and that some one should be appointed as representative of the city to act in conjunction with the Central Trust Company. Fortunately, there is in Kansas City a gentleman whose character, abilities, and experience are such as to be a guaranty to the city that its interests will be protected, and whose reputation as a lawyer and jurist has become so far national that no bondholder, and no financial institution in the country, can hesitate to have him take part in the distribution of any sum of money. I refer to ex-Chief Justice Black, of the supreme court of the state of Missouri, and, if he will accept the appointment, an order may be entered designating him as a commissioner to act on behalf of the city, and providing that no money shall be paid except upon a check countersigned by him, and directing him to act in conjunction with the Central Trust Company, the party named by at least the majority of the subsequent lien holders, in distributing the money according to the terms of the agreement, all the time reserving a sufficient amount to satisfy the claims of those lien holders who do not enter into the agreement. I have no doubt that Judge Black's wisdom and experience will greatly facilitate the closing up of this matter. He will, of course, see that proper releases are executed by the various trustees and filed in the proper offices. By this arrangement the objections to the sufficiency of the releases tendered may be avoided, and at the

same time the rights of both parties be fully protected. The details of this order can doubtless be arranged by counsel. If not, they will be settled by one of the judges of this court. I think this is all that need be said in reference to the matter of the exceptions. The company has filed a motion for an order on the city to pay over the past-due hydrant rentals, or some portion thereof. I think they should be paid, but, as possibly the whole matter may be closed up shortly, I simply continue the motion for such order for 60 days.

PHILIPS, District Judge, concurs.