## OMAHA WATER CO. v. CITY OF OMAHA.

(Circuit Court of Appeals, Eighth Circuit. April 7, 1908.)

### No. 2,683.

1. WATERS AND WATER COURSES—CONTRACT BY CITY FOR PURCHASE OF WATER-WORKS—ASCERTAINMENT OF VALUE BY APPRAISERS—VALIDITY OF APPRAISAL.

A city ordinance granting a franchise to a water company reserved to the city the right, at its election, to purchase the works of the company after a stated term at an appraised valuation "ascertained by the estimate of three engineers, one to be selected by the city council, one by the waterworks company and these two to select a third." The city having elected under authority of a state statute to exercise its option, appraisers were selected as therein provided, who organized as a board, and, after an investigation extending over three years, filed a report fixing the value of the property, which was signed by two of the number, but upon which the third noted his dissent. *Held*, that the matter in question was one of public concern, and that, under the rule of law applicable in such case, the appraisers having all qualified and acted throughout, the decision of the majority was a valid exercise of the power.

2. SAME—PROCEDURE BY APPRAISERS.

The fact that appraisers selected to make a valuation of the property of a water company, which a city had elected to purchase under an option reserved in the company's franchise, took the oral testimony of witnesses who were examined by counsel for the respective parties, did

162 F.—15

not limit them to such method of procedure throughout, where it was understood and agreed by the parties in the beginning that they might arrive at the facts by any method or means deemed advisable by them, and their subsequent action in causing the books of the company to be sent to another city where they were in session, and to be there examined by experts, in the absence of counsel, did not invalidate their appraisal where their good faith was not questioned.

3. SAME—POWERS OF APPRAISERS—DISCRETION AS TO METHODS OF PROCEDURE.

A valuation of property by appraisers selected as experts under a contract for its sale is not an arbitration, and the appraisers do not act judicially, nor are they bound by the rules relating to arbitrations, but, so long as they act honestly and in good faith, they have a wide discretion as to their methods of procedure and sources of information.

4. MUNICIPAL CORPORATIONS — POWERS — PURCHASE OF WATERWORKS—CONSTRUCTION AND VALIDITY OF CONTRACT.

In 1880 the city of Omaha granted a franchise to a water company under Laws Neb. 1879, p. 99, § 27, which authorized the city to construct and maintain waterworks "either within or without the corporate limits of the city," and to contract with others to construct and maintain waterworks on such terms as might be agreed upon. In the ordinance granting such franchise, the city reserved the right to purchase the works of the company after 20 years at an appraised valuation. By a subsequent statute, still in force in 1903, the city was authorized to appropriate private property for waterworks purposes, or any system already constructed, the power to extend a distance of 10 miles beyond the city limits. Laws 1903, p. 66, c. 12, required the city to either construct or purchase waterworks and authorized it to take the necessary steps to acquire such water plant "by virtue of any rights inuring to such city through contract or otherwise." In 1903 the city elected to purchase the company's plant under the option reserved in the ordinance of 1880, and appraisers were selected by the parties to make the valuation. When the works were constructed, it was necessary to take the water from the Missouri river above the city, and the intake, pumping station, and reservoirs were located in the town of Florence, and some miles outside the city limits. Between that time and 1903 the city had grown in population from 30,000 to 125,000 or more; the adjoining city of South Omaha containing over 30,000 population, and other adjoining, but separate, municipalities had grown up, into all of which, including the town of Florence, the company had extended its distribution system which was supplied with water from its station at Florence. *Held* that, under such statutes, the city had power to acquire the property of the company outside, as well as inside, of its limits, and that, when it made its election, it elected to purchase the entire system, and could not require the company to sell its pumping plant and the pipes connected therewith which extended into and lay within the city limits, and to retain its outlying distribution systems.

5. CONSTITUTIONAL LAW—CONTRACTS PROTECTED FROM IMPAIRMENT—CONTRACT BY CITY.

The election by a city, expressed by ordinance duly authorized by statute, to exercise an option reserved in a prior ordinance to purchase the property of a water company which ordinance was accepted by the company, creates a contract binding on both parties, and which cannot be impaired by any subsequent action of the city or of the Legislature of the state taken after the property has been appraised as provided by such contract.

6. WATERS AND WATER COURSES—CONTRACT BY CITY FOR PURCHASE OF WATERWORKS—VALIDITY OF APPRAISAL.

An appraisal of a large system of waterworks under a contract of purchase will not be invalidated because the title to a small part of the property not vital to the integrity of the system is afterward found to be defective, nor because it may include pieces of property not necessary

to the system; a court having power to make an equitable adjustment of such matters between the parties.

Appeal from the Circuit Court of the United States for the District of Nebraska.

Howard Mansfield (R. S. Hall and Herbert C. Lakin, on the brief), for appellant.

John Lee Webster and Carl C. Wright (Harry E. Burnam, on the brief), for appellee.

Before HOOK and ADAMS, Circuit Judges, and CARLAND, District Judge

HOOK, Circuit Judge. This is an appeal from a decree of the Circuit Court for the District of Nebraska dismissing the bill of complaint of the Omaha Water Company to compel the city of Omaha to complete the purchase of complainant's system of waterworks in accordance with a contract giving the city an option to purchase, the exercise of the option, and an appraisal fixing the price to be paid. The objection of the city is to the appraisal.

The installation of the waterworks was begun in 1880 by a predecessor in title of the Omaha Water Company; the original franchise ordinance having been adopted in that year in the exercise of power granted by a Nebraska statute of 1879. Section 14 of the ordinance provided that, after the expiration of 20 years, the city should have a right to purchase the works at an appraised valuation "ascertained by the estimate of three engineers, one to be selected by the city council, one by the waterworks company, and these two to select a third." Nothing was to be paid for the unexpired franchise of the company. The works were completed in 1883, and on September 4th of that year an ordinance was adopted accepting the works as a full and complete compliance with the obligations to the city. In 1903 the Nebraska Legislature passed an act which in effect required the city to buy or build a system of waterworks. Consequently, on March 2d of that year, it was declared by ordinance to be necessary and expedient for the city "to purchase the system of waterworks operated by the Omaha Water Company," and that the mayor and council "so elect and determine to purchase and acquire such waterworks by virtue of the rights inuring to said city through the contract between said city and the grantors of said water company, and as authorized and provided by section 14 of ordinance No. 423." Ordinance No. 423 is the ordinance of 1880. Thereupon the water board of the city, having been recently created by legislative act and invested with authority in the premises, nominated an appraiser, and the nomination was confirmed by the city council. The company then named one and those two selected the third. These men were hydraulic engineers. Two of them lived in Chicago, Ill., and one in Milwaukee, Wis. On July 20, 1903, the appraisers organized by the election of one of their number as chairman and another as secretary. Their report which was submitted July 7, 1906, fixed the aggregate value of the property at $6,263,295.49, a sum barely sufficient for the discharge of the outstanding mortgage bonds issued by the company in-

cluding a small premium to be paid upon their call before maturity. The report was signed by but two appraisers. Appended thereto was the following, signed by the other who was the one selected by the water board and the city: "I do not concur in the above report, nor in the values as fixed therein." The water board whose jurisdiction had in large measure superseded that of the city council thereupon declared that it rejected the appraisal. The company then tendered a deed conveying the system of waterworks and demanded the payment of the appraised value. Payment being refused, suit was brought by the company.

The city says the appraisal is void for several reasons, the two most important of which are: That the appraiser named on behalf of the city refused to concur, and that the appraisers were guilty of misconduct. It is also claimed that improper items of property and elements of value were included in the appraisal, and that the deed tendered by the company embraced property which the city of Omaha had no power to acquire or operate because it lay beyond its corporate limits. Did the refusal of one of the appraisers to concur defeat the appraisal? The rule is that, when the subject of the inquiry or controversy is of a private character, all intrusted with the power of ascertainment or decision must agree, unless it is otherwise provided by the interested parties. Hobson v. M'Arthur, 16 Pet. 182, 192, 10 L. Ed. 930. But it is equally well settled that when the matter in question is of public concern, all being qualified and having assembled and acted, the finding or decision of a majority is a valid execution of the power. Colombia v. Cauca Co., 190 U. S. 524, 23 Sup. Ct. 704, 47 L. Ed. 1159; Grindley v. Barker, 1 Bos. & P. 229; King v. Beetson, 3 Term, 592; Withnell v. Gartham, 6 Term, 388; Gas Co. v. Wheeling, 8 W. Va. 320; Green v. Miller, 6 Johns. (N. Y.) 39, 5 Am. Dec. 184; Ex parte Rogers, 7 Cow. 526; Downing v. Rugar, 21 Wend. (N. Y.) 178, 34 Am. Dec. 223; Crocker v. Crane, 21 Wend. (N. Y.) 211, 34 Am. Dec. 228; People v. Nichols, 52 N. Y. 478, 11 Am. Rep. 734; The People v. Walker, 23 Barb. (N. Y.) 304; Young v. Buckingham, 5 Ohio, 485; Patterson v. Leavitt, 4 Conn. 50, 10 Am. Dec. 98; Eames v. Eames, 41 N. H. 177, 181. That the first of these rules is not applied where matters of public interest are involved is doubtless due in part to a question of its practical wisdom—to the fact that its application generally leads to continued controversy and litigation. The views of those whose interests are at stake are likely to be adopted and insistently maintained by the appraisers or arbitrators they personally select, and the chance of agreement and final disposition of the matter is not materially enhanced by the submission On the other hand, the rule that is applied in cases of public concern is in harmony with the plan of representative governments which move and act by majorities. Public officials are chosen, laws enacted, rights judicially determined, and business transacted by majorities. The affairs of subordinate divisions of the state, such as counties, townships, and cities are conducted by local boards or bodies whose controlling and effective voice is that of the greater number of the members. The rule pervades almost every branch of the public service where power is lodged in the hands of several, and it is a distinctive

recognition of the truth that the transaction of public business cannot wait for unanimity. All of the steps leading to the construction of the waterworks and the reservation of the right of purchase from the original organization of the city itself down to the adoption of the ordinance of 1880 were manifestations of majority power. The legislative direction to the city to buy or build, its ordinance of 1903 electing to buy, the nomination of an appraiser by the water board and his confirmation by the city council were all expressions of the will of the majority. And, if the city shall acquire the waterworks the levy and collection of taxes, the payment of the purchase price and the conduct of the business in the future are matters that will be committed to public bodies acting by the greater number of their members. And it may be observed that, on the other hand, the corresponding acts of the water company were the acts of a majority of the members of its managing board. The appraisal of the waterworks is an intermediate step in this long progression, and it would be strange, indeed, if by mere construction of law its validity should be held to rest upon unanimity of concurrence, a requirement long since rejected as impracticable and not suited to matters affecting public interests. Experience teaches that in cases like this the parties are seldom able to agree upon the value where the company is required by force of circumstances to part with the ownership of its property. It also teaches that appraisers are apt to be partisans of those who name them, and that unanimous agreement is the rare exception. The provision of the ordinance of 1880 was intended to be a practical one and to be productive of an actual appraisal of the waterworks. It was not intended that the appraiser selected by the city or the one selected by the company might at the last minute, when all the work was done, cause the appraisal to miscarry by mere refusal to join in the valuation found by the other two. As was said in Colombia v. Cauca Co., supra: "Of course, it was not expected that a commission made up as this was would be unanimous." The engineer named by the city acted with his associates through an expensive investigation extending over three years, and, when the report was finally made up and signed, he simply appended thereto the bare, unexplained statement that he did not concur in the report or in the values fixed. The water board then resolved to reject the appraisal and to name a new appraiser in its behalf, though it cannot reasonably be anticipated that new appraisers would be more likely to agree unanimously. It was not contemplated by the ordinance of 1880 that either party, the city or the company, could at will arbitrarily defeat the appraisal contracted for, and yet in practical effect that is what is contended. The case is not as though one of the appraisers resigned and left the board incomplete during the progress of its labors. All continued to the end. Both the city and the company had the benefit of their experience and joint investigation, and the final valuation after conference and interchange of views sufficiently bears the impress of the one who dissented because he did not wholly have his way.

It is not improper to observe that until the report was made the three appraisers were regarded by all parties as composing a board or body invested with powers in their aggregate capacity. Imme-

diately upon their selection they organized as a "Board of Appraisers" by the election of one of their number as chairman and another as secretary, and thereafter they constantly referred to themselves as a board. They were so addressed by counsel for the city when he outlined a method of procedure for their adoption. While the appraisal was in progress, the water board and the city filed a bill in the Circuit Court against the appraisers and the company to secure authoritative directions as to the appraisal. In this bill of complainants, in the answer of the company and in the decretal order of the court, there is constant reference to them as "the board" and the "board of appraisers." The popular conception of a board is that like tribunals in general it acts as a unit and speaks through a majority of its members.

The case of Gas Co. v. Wheeling, 8 W. Va. 320, is quite similar to the one at bar. The act incorporating the Wheeling Gas Company contained a provision that at the expiration of 20 years the city might, if it so elected, purchase the gas works at a price to be agreed on or to be ascertained "by the award in writing of three persons to be chosen, the first by the directors of said company, the second by the council of said city and the third by the two thus chosen." The city having elected to purchase and there being a disagreement as to the price, the appraisers or arbitrators were selected. All three of them participated in the investigation, and at the conclusion two of them signed the award. The third merely expressed thereon his dissent. The city tendered the price fixed, the company refused it, the city deposited the money in bank to the order of the company, and took possession of the works. In an action by the company to regain possession, it was held among other things that the matter was of public interest and the award was valid. In People v. Nichols, 52 N. Y. 478, 11 Am. Rep. 734, there was an appropriation by the state for the purchase from a private person of certain relics, to be paid only upon the certificate of three persons named in the act that the relics were in their opinion genuine, and that it was desirable in their judgment that they be placed in the museum of the state library. The parties named having met and inspected the relics, two of them signed the certificate and recited therein that the third refused. Justice Peckham, in delivering the opinion of the court, said:

"In my judgment, by the well-settled rule at common law, this power would have been legally exercised by the signature of two of the three to the certificate when all three assembled to pass upon the question. The only answer specially urged against this rule is that it solely applies 'to matters of public concern'; that 'as to matters of private concern,' as this is claimed to be, all must join to make a valid execution of the power. * * * Then is this a matter of private concern? We are all of opinion it is not. The cases referred to by the respondent cannot fail to establish his doctrine. They hold that arbitrators, to determine controversies between individuals, are engaged in matters of private concern. But, where appraisers act between individuals and the state, it is a matter of 'public concern,' and a majority act as the whole, when all have met. In the case at bar the Legislature desired to purchase, upon certain terms, what they regarded as of interest and value to the public. It was a question between an individual and the state. This would seem, then, to be plainly matter of public concern. This certifi-

cate, therefore, would have been legally given at common law when signed by a majority."

Colombia v. Cauca Co., 190 U. S. 524, 23 Sup. Ct. 704, 47 L. Ed. 1159, was a bill by the Republic of Colombia to set aside an award of a special commission settling in favor of the Cauca Company a controversy over a concession to build and operate a railroad, and accompanying land grants, etc., and a claim that the concession and grants had been forfeited. The commission was composed of three members, one selected by each party to the controversy and the third by the Secretary of State of this country and the Colombian minister at Washington. A few days before the expiration of the time limited for their action, and when little remained to be done except to sign the award, the Colombian commissioner resigned and the other two made the award. Colombia said the award was void because made by but two of the three commissioners. Several reasons were given by the Supreme Court for sustaining the award, among them one that the matters involved were of public concern.

The city contends that the contract with the water company for the acquisition of the waterworks is not a matter of public concern, and it cites Illinois Trust & Savings Bank v. Arkansas City, 76 Fed. 271, 22 C. C. A. 171, 34 L. R. A. 518, and similar cases to the effect that such contracts are of a private or business nature. But that was said in contradistinction to acts done in the exercise of the legislative and governmental powers of municipalities. It has never been held, and never can be with reason, that a contract between a water company and a city for the acquisition by the latter of a system of waterworks is not a matter of public concern. By common consent a water company is called a public service corporation, and is therefore given the use of the public streets for its mains and pipes. Its system of waterworks constitutes a public utility of vital importance to the health and well-being of a city and its inhabitants. The city of Omaha was invested with power to appropriate private property for the public use in constructing and operating waterworks of its own. The rates and charges of water companies are subject to regulation by the state within constitutional limitations; and this on the theory that the property and operations of such a company are affected with a public interest. To say that the matters submitted to the appraisers in this case were not of public concern is to disregard the essential nature of things. It is true that in People v. Nichols, 52 N. Y. 478, a state law provided for the purchase of the relics, and in Gas Co. v. Wheeling, 8 W. Va. 320, the original authority to purchase the gas works was found in the statute incorporating the company, but the proximity or remoteness of a state statute does not determine the character of the subject-matter, whether of private or public concern, though were it otherwise the fact remains that the reservation by the city of Omaha of the right to purchase at an appraised value was a condition authorized by state statute, and, when the election was made, the city was acting under direct mandate of the Nebraska act of 1903. Laws 1903, p. 66, c. 12. Considering the character of the parties, the nature of the contract, the property in

question, and the end to be attained, the matter involved in the appraisal was one in which the public was greatly interested, and all the appraisers having acted two of them could fix the value.

The city also claims that the appraisal is void because of misconduct of the appraisers. The chief complaint in this respect is that the water company sent its books to Cincinnati, Ohio, where the appraisers held a meeting, and thence to Chicago, Ill., where they had them examined by an audit company selected by them for the purpose, and that the city was not given access to the books nor permitted to examine witnesses upon their contents. Emphasis is placed on the fact that for more than a year previously the appraisers held open sessions and received oral testimony from witnesses who were examined and cross-examined by counsel, and it is asserted that the books were received after the inquiry had been closed. The company contends that the action of the appraisers was consistent with the advisory instructions given them when they entered upon their duties, and also with the character of the proceeding in their charge. At the beginning of their inquiry the appraisers were addressed by counsel upon their method of procedure. The city attorney said:

"As to the matter of the procedure to be adopted by your board, as to the method of arriving at the amount of property owned by the water company, and the determination of its value, the city of Omaha suggests that this board, having been appointed as experts in regard to the value of such property, ought to make a personal investigation as to the amount and extent of property of the water company, together with its condition, and determine therefrom its value. As to the method of arriving at the amount and condition of the property of the water company, the city of Omaha suggests that this board may arrive at such facts by any method or means deemed advisable by it, but that, if the board shall determine to take proof and testimony before it, it should go no further than to the question of the amount and condition of the property, and that said testimony should not be conclusive upon this board, but simply for its advice and information in the matter. It is not the opinion of the city of Omaha that it would be proper or necessary to call expert witnesses as to the value, since the members of the board have been selected as experts [to] whose judgment the question of value must be submitted upon the examination of the property."

That the appraisers at first received evidence in the presence of counsel did not irrevocably commit them to a continuance of that course; and counsel are in error in saying the inquiry was closed when they ceased doing so. It was distinctly announced at the time by the chairman of the board that much more information must be sought than that already presented, and "the board will undoubtedly wish to call on the city and the company for special information as to details the necessity for which will develop as the work proceeds." What they did with the company's books was not exceptional. In performing their duties the appraisers did much investigating in the absence of the parties, doubtless believing that their course of procedure was largely within their discretion, and it cannot be doubted that it was in view of the character of the submission for appraisal and the instructions given them at the beginning. There is no ground for questioning their entire honesty and sincerity. The books were not submitted, audited, or examined at the instance of the company, nor did it offer them in evidence as such act is usually

understood in a legal proceeding  The sending of the books to Cincinnati and Chicago was at the instance of the appraisers, and the only participation by the company in the examination was to explain the method of keeping them.  All three appraisers participated in what was done.  There was no concealment.  We have the bare fact that the books were sent and examined.  What, if any, use was made of the information contained in them, does not appear.  We think undue importance is given this matter merely because of the adventitious fact that the books were shipped to Cincinnati and thence to Chicago.  If the appraisers had gone into the office of the company at Omaha and demanded the production of all of its records for examination by themselves or by an expert bookkeeper selected by them without participation by either the city or the company, it is doubtful any complaint would have been made.  It was not intended by the submission to three expert engineers for appraisal that attorneys should always attend them and participate in every inquiry they made to secure information, nor does that seem to have been the view of counsel before the appraisal was made.  It may at once be admitted that, were this an arbitration, the examination of the books in the absence of counsel would have defeated an award.  But there is a clear distinction between an appraisement by valuers and an arbitration, though the latter term is frequently but incorrectly applied to both proceedings.  An arbitration presupposes a controversy or a difference ·to be tried and decided, and the arbitrators proceed in a judicial way, sometimes as an adjunct to a court of justice.  Their investigation is in the nature of a judicial inquiry, and rules of procedure must be strictly observed or their award will be void.  On the other hand, an appraisal or valuation is generally a mere auxiliary feature of a contract of sale, the purpose of which is not to adjudicate a controversy but to avoid one.  Thus, if A. and B. contract, the former to sell, and the latter to buy, certain property at the value thereof as fixed by X., Y., and Z., the latter are appraisers, not arbitrators, and are not governed in their proceedings by the rules relating to arbitration.  As long as appraisers act honestly and in good faith, they have a wide discretion as to their methods of procedure and sources of information.  Generally speaking, they may inform themselves in any way that an honest seeker for the truth would adopt.  While there are many cases in which no distinction is made between the two proceedings, in most of them it will be found either that the term "arbitration" was used in the general sense of a submission of some matter to third persons for ascertainment or decision, or that some feature peculiarly the subject of arbitration was involved.  Sometimes the doubt whether the submission is in arbitration or appraisal is determined by the character of those to whom it is made and the method of their selection.  Thus in Bottomly v. Ambler, 38 L. T. 545, 26 W. R. 566, it was held to be an appraisal because two of the men selected were agents of the interested parties and all three were experts in the matter to be determined.  When the attention of the courts has been directed to the distinction, it has been generally recognized both in England and in this country.  Kelly v. Crawford, 5 Wall. 785, 18 L. Ed. 562;  Collins v. Collins, 26

Beav. 306, 28 L. J. Ch. 184; Bos v. Helsham, 4 H. & C. 642, 36 L. J. Ex. 20, 15 L. T. 481; In re Wilson and Green, 56 L. J. Q. B. 530, 55 L. T. 864; Guild v. Railroad Co., 57 Kan. 70, 45 Pac. 82, 33 L. R. A. 77, 57 Am. St. Rep. 312; James v. Schroeder, 61 Mich. 28, 27 N. W. 850; Railway v. Moore, 64 Pa. 79; Norwich Gas, etc., Co. v. Norwich, 76 Conn. 565, 57 Atl. 746; Palmer v. Clark, 106 Mass. 373; Noble v. Grandin, 125 Mich. 383, 84 N. W. 465; Wurster v. Armfield, 175 N. Y. 256, 67 N. E. 584; Conference of M. E. Church v. Seitz, 74 Cal. 287, 15 Pac. 839.

In Railway Co. v. Moore, 64 Pa. 79, 91, it was said:

"An award is the judgment of a tribunal selected by the parties to determine matters actually in variance between them—not merely to appraise and settle the price of property contracted for under the stipulation that this term of the contract was to be so ascertained. Had the parties made the contract, and afterwards, on a dispute arising, chosen arbitrators to determine what was due upon it, that might have been an award. The case is entirely different where the parties originally agree to buy and sell at a sum to be fixed by an appraisement to be made by a third person or persons. * * * Nor is such an appraisement subject to the strict rules governing arbitrations and awards. * * * It would not be necessary that the appraisers should decide upon evidence heard in the presence of the parties. They could decide, and indeed would be expected to fix the value of the articles, upon their own knowledge of the subject, though doubtless they might seek information from other quarters."

In Palmer v. Clarke, 106 Mass. 373, 389, the court said:

"A reference to a third person to fix by his judgment the price, quantity, or quality of material, to make an appraisement of property and the like, especially when such reference is one of the stipulations of a contract founded on other and good considerations, differs in many respects from an ordinary submission to arbitration. It is not revocable. The decision may be made without notice to or hearing of the parties, unless such notice and hearing be required by express provision or reasonable implication; and it may be made upon such principles as the person agreed on may see fit honestly to adopt, or upon such evidence as he may choose to receive."

The other complaints of the conduct of the appraisers are disposed of by what has been said.

It is also contended that the appraisal includes property which the city did not contract to purchase and was without power to own. This refers to the extensions of the waterworks system beyond the corporate limits of Omaha into the city of South Omaha and the towns of Dundee and Florence and the territory known as East Omaha. All these immediately adjoin the city of Omaha—Florence on the north, East Omaha on the east, South Omaha on the south, and Dundee on the west. South Omaha, Dundee, and Florence have separate municipal governments under the laws of Nebraska. In 1880, when the installation of the system of waterworks was commenced, Omaha was a city of about 30,000 inhabitants, but it grew rapidly, and at present contains 125,000 or more. In South Omaha, which was incorporated in 1886 and in 1903 contained more than 31,000 people, there are located extensive industries in the conduct of which residents of the larger city are interested and which require great quantities of water. These two cities are connected by continuous streets traversed by continuous street car lines. In the

year 1900 Dundee had 400 inhabitants and Florence 688. All these cities and towns are practically one metropolitan city, and it needs no foresight to predict their ultimate consolidation. Indeed, the laws of the state now provide that "any city, town or village adjoining any city of the metropolitan class may be annexed or merged with such city of the metropolitan class" whenever a proposition therefor has been approved by the majority of the votes in each city, town or village cast on such proposition at a general election. Laws 1905, c. 14, § 2. Obeying the law of its existence and responding to the necessities of the public, the water company extended its mains and pipes throughout the city of Omaha and into these adjacent municipalities. That it did so for profit is but part of the proposition; that it was its duty to do so conclusively appears from a survey of the situation. Florence, Omaha, and South Omaha are on the west bank of the Missouri river. It was recognized in the beginning that the water supply for Omaha would have to be taken from the river and considerations of public health imperatively demanded that it be taken from a point far enough up the river so that it would not be contaminated by the sewage of the cities. With this in view an intake, pumping station, and settling reservoirs were permanently located about 9,000 feet north of the north line of the city of Omaha, and at present they constitute the principal source of supply of the water that is furnished all the cities and villages. The waterworks of the company is one complete, uniform system planned and designed to serve the municipalities and their inhabitants as one aggregate community. It is incapable of segregation into parts so as to make a separate and independent system for each city and town. There is no pumping station in East Omaha, Dundee, or South Omaha. A refusal of the company to extend its mains and pipes into these communities would have been indefensible. It would have resulted in depriving the villages of fire protection and water for domestic consumption since the cost of a separate system of waterworks would be prohibitive to a community of a few hundred inhabitants, especially to Dundee because of its location on the heights west of Omaha. For South Omaha pumping works would have had to be installed at the river bank north of Omaha and flow lines run through the streets of the latter city, involving a wasteful and unnecessary expenditure of money and an unjust burden upon the people and the industries in which both cities are interested. The growth of the system of waterworks throughout the larger city and into these suburban and adjacent communities was a natural one, and considerations of justice not only to the company, but also to the inhabitants of the smaller communities, require that no dismemberment of the system be made unless the law imperatively requires it. The city of Omaha says it is willing to purchase the property within its corporate limits and also the intake, pumping station, and reservoirs at Florence, with the connecting mains, but it is not willing to purchase the distribution systems in Florence, East Omaha, South Omaha, and Dundee. We may dismiss from further consideration the distribution system in Florence, because the duty to maintain and operate it was one

of the conditions upon which that village granted to the water company the right to install its works there and use its public grounds. To continue that maintenance and operation is a burden which must accompany the ownership of the supply works. Two reasons are assigned for cutting off and excluding those parts of the system lying in East Omaha, South Omaha, and Dundee: First, that the city has no power to acquire them since they lie without its corporate limits; and, second, if it has the power, it has not exercised it.

We think, if the statutes of the state are construed in the light of conditions to which they were intended to apply, they disclose ample authority in the city to own and operate the entire system of waterworks including the parts beyond its boundaries. In 1880, when the franchise was granted, the city had power (Laws 1879, p. 99, § 27) "to erect, construct and maintain waterworks either within or without the corporate limits of the city * * * and to contract with and procure individuals or incorporations to construct and maintain waterworks on such terms and under such regulations as may be agreed on." By virtue of this authority the ordinance of 1880 was adopted. In 1897 (Comp. St. 1901, c. 12a, § 27) Omaha was given power "to appropriate private property for the use of the city for * * * waterworks, including mains, pipe lines and settling basins therefor, the right and power * * * to extend a distance of ten miles from the corporate limits of the city"; also "power to appropriate any waterworks system, plant or property already constructed to supply the city and the inhabitants thereof with water, or any part thereof, whether lying or being wholly within said city or in part therein and in part without the city, and within ten miles from the corporate limits of such city, including all real estate, buildings, machinery, pipes, mains, hydrants, basins, reservoirs, and all appurtenances reasonably necessary thereto and a part of or connected with said system, plant or property, and franchises to own and operate the same if any." This law was in force in 1903 when the city made its election to purchase. The act of 1903 (Laws 1903, c. 12, p. 66) made municipal ownership compulsory, and the city was directed to construct or purchase. Section 3 commanded the mayor and council of the city "to take the necessary steps to acquire such water plant under the powers granted to such city or by virtue of any rights inuring to such city through contract or otherwise." Section 10 provided that the authority and powers of the water board should extend as far beyond the city limits as it might deem necessary, not exceeding 10 miles. A provision of a prior law granting power to the city to construct or purchase waterworks within or without the city was retained, but so amended as to adapt thereto the powers and functions of the water board. Section 135. There were thus three methods provided by law by which the city could secure a system of waterworks: First, by its own construction in the city and within 10 miles of its exterior limits, exercising in aid thereof the power of eminent domain; second, by appropriating a system already completed whether lying wholly within or partly within and partly without the city, but within the 10-mile limit; and, third,

by purchasing an existing system lying within or without the city if the right to do so had been reserved to the city by contract. But, however acquired, the jurisdiction of the water board in respect thereof was supreme and extended a distance of 10 miles beyond the city limits. We do not think this studied and persistent reference to the territory beyond the city limits is wholly satisfied by saying it was a mere provision for the establishment of the supply works. Doubtless that was in mind, but it was a fact publicly known that the Omaha system extended into the adjacent communities and a custom thereby secured that constituted an important part of its value of which a purchaser would naturally desire to avail himself, and the later laws of the state, applying as they did exclusively to the city of Omaha, were framed in view of that known condition. The Legislature was not blind to the history of American cities, their rapid growth in population, and the continual expansion of their boundaries, nor to the fact that, while there may be clustered around a growing city smaller cities and villages, they really constitute one center of population with a community of interest, and that sooner or later the arbitrary lines of division will disappear. Nor can it be conceived that the Legislature intended that these smaller municipalities should be subjected to the oppressive burden of maintaining separate means of procuring that which is so vital to health and safety as a supply of water. In other respects, also, the laws affecting Omaha had regard to its future growth and development. Authority was given (Comp. St. 1901, c. 12a, § 101b) to acquire lands within three miles of the city limits for public parks, parkways, and boulevards, and it was provided that, if the lands acquired were within the corporate limits of any other city or village such other city or village should cease to have jurisdiction over them.

We are also of the opinion that, when the city made its election, it elected to purchase the entire system of waterworks. The ordinance of 1880 by which the franchise was granted, related to a system of waterworks "within and adjacent to the city of Omaha, in Douglas county, state of Nebraska, for the purpose of supplying said city and the citizens and inhabitants thereof with water." The ordinance required that the pumping capacity of the works keep pace with the growth of the city, and that in a practical sense meant not merely from day to day, but implied the exercise of business foresight in making reasonable provision for the future. The right of purchase reserved by section 14 of the ordinance refers, of course, to the system of waterworks designed for supplying the city of Omaha with water, but it includes everything fairly appurtenant to the system as a whole. Section 11 provides that, upon failure to comply with the terms of the ordinance, all rights thereunder shall be forfeited, and the city of Omaha shall become vested with the ownership "of said waterworks and property appurtenant thereto and connected therewith subject to the payment of a just compensation therefor to be ascertained as provided in section 14." In 1896 the city of Omaha commenced a suit to forfeit the franchise granted by this ordinance and to obtain title to the system of waterworks.

By the averments of its bill and references to the mortgages on the property, it charged that all of the property of the company in Douglas county, Neb., specifically including that in Florence and South Omaha, was absolutely essential to the operation of the waterworks, to the performance of the public duty of the defendant company, and to the fulfillment of its contract obligations to the city; and the city asserted its right "to take possession and control of the said water works plant, and all the property connected therewith or appertaining thereto." The ordinance adopted under the mandate of the act of 1903 declared it necessary and expedient for the city to purchase "the system of waterworks operated by the Omaha Water Company," and recited that the election to do so was by virtue of the provisions of section 14 of the ordinance of 1880. The declaration and recital were in effect an assertion that the right of purchase under that ordinance embraced the entire system operated by the company. At the first meeting of the appraisers, the chairman of the water board stated they wanted and expected to purchase the entire property if they could possibly do so; but, in view of the question as to the power of the city, they wanted a separate appraisal of the outlying properties. The water company has always protested against the dismemberment of its property. In 1905 the city and the water board sued the company and the appraisers in the court below to obtain authoritative instructions for the appraisal then in progress. After a trial an order was made that the property be appraised as an entirety and also in parcels with a separate statement of certain elements of value, so that the report would be available whatever the ultimate decision of the rights of the parties might be. The trial judge was of opinion that the election ordinance of 1903 contemplated the purchase of the entire system, though he thought it doubtful that the ordinance of 1880 in which the right of purchase was reserved was so comprehensive.

A contract of sale and purchase between the company and the city arose in 1903 which was not subject to impairment by subsequent legislation; but it may be well to notice some provisions in the act of 1905 adopted in anticipation of municipal ownership and operation of the waterworks. Laws 1905, p. 175, c. 15. By that act the water board was authorized to contract with any adjacent municipality to supply it with water for public or private purposes or with any person, copartnership, or corporation engaged in that business. It is said, in effect, that the express grant of power to contract with an adjacent municipality or with a corporation engaged therein in supplying water is an implied denial of power to furnish water direct to the inhabitants, and therefore the Legislature intended the outlying distribution systems should not be acquired by Omaha but should be left on the hands of the company to hold or sell if the smaller towns chose to buy. In other words, the contention is that Omaha has no power to own or operate the pipes and mains beyond its limits, but may contract to furnish water to the owner whether it be the company or an adjacent municipality. Ordinarily power in Omaha as owner of the system within its limits and the supply station at

Florence to contract with an adjacent municipality to supply it with water for public and private purposes would warrant the adoption of either of two methods: First, through a distribution system owned by Omaha itself in the adjacent territory, in which event it would deal directly with the consumers, public and private, as it would within its own boundaries; and, second, the delivery, say at the city limits, into a distribution system owned either by the adjacent municipality or by the water company. The fact that the power granted was to contract with an adjacent municipality would not necessarily exclude the first of these because the furnishing of water for both public and private consumption is invariably done under contract with the municipality in which the use is enjoyed. But the provision in the act for compensation to Omaha for this service would seem to preclude any direct relation between it and the consumers in the adjacent communities and to imply that it should deliver the water in quantity, leaving to others the duty of distribution and the relations with consumers the different classes of whom are served at different rates. The provision referred to requires that all water furnished by Omaha for use in adjacent municipalities shall be measured by meter at the expense of the adjacent municipality or company, and the rate per 1,000 gallons "shall not be less than the gross average income per thousand gallons for all water" used in Omaha, including a fixed allowance for hydrant service therein. This seems to contemplate a wholesale, flat rate, and settlement only with the adjacent municipality or the company as the case may be.

If the act of 1905 affected the fixed contract relations between Omaha and the company, a result would follow so remarkable and so inequitable it is difficult to believe it was intended. If Omaha now bought only the property within its borders and the supply works, and left the outlying distribution systems on the hands of the company, the latter would either have to sell them to the adjacent municipalities, or to Omaha if hereafter invested with power, at their own figure, or continue business under such conditions as would practically destroy the value of its property. In the latter case, it would be confronted with the problem of procuring a water supply for the smaller communities since the existing facilities would be owned by Omaha. Of course, separate, independent supply works on the river north of Omaha, the only feasible location, would be out of the question. Besides the disproportion of cost to the amount of consumption, the plan would not be practicable unless Omaha granted the right of way for flow lines through her streets. The alternative would be to apply to Omaha for water. If Omaha furnished the water, say, for example, to be used in South Omaha, the only property it would employ in that service would be its supply works at Florence and its flow lines or mains running thence to and through the city to the southern limits thereof where delivery would be made into the distribution system in South Omaha still owned by the company; yet, under the act of 1905, it would charge the company a rate per 1,000 gallons not less than the gross income per 1,000 gallons derived by it from all water furnished within its own limits, includ-

ing the estimate for hydrant service. In this gross income would be not only cost of maintenance and operation, but also interest, return, or profit upon Omaha's entire investment. The rates paid by consumers in Omaha which would go to swell the gross income would be for water delivered at their doors, but the water for South Omaha would be delivered on its northern boundary, and remain to be distributed to consumers through the mains and pipes of the company. To enable the company to receive cost of maintenance and operating expenses, saying nothing of returns on its investment in South Omaha, it would have to charge more than it paid for water; but the rate the company would be required to pay under the act of 1905 is not less than the average of rates to public and private consumers in Omaha, and it is known that the ordinance of South Omaha under which the company is authorized to do business there provides that the Omaha rates shall prevail in that city. The company could not charge more than it would have to pay. It thus appears that the 31 miles or more of mains and pipes in South Omaha regarded as a distribution system, and not as so much iron, would be rendered worthless in the hands of the company. The situation to which the act was directed was quite complicated, and it is preferable to believe some other purpose was in view to express which the language was unhappily chosen.

When the report of the appraisers came in, the water board adopted a resolution rejecting it, and it is claimed that the act of 1905 conferred authority upon the board to do so. But in 1903 the city, proceeding in accordance with the act of that year, availed itself of the right reserved in the ordinance of 1880 by electing to purchase; and appraisers were duly chosen and were engaged in the performance of their duties when the act of 1905 was passed. The continuing offer of the company to sell arising from the acceptance of the ordinance of 1880 and the election of the city in 1903 to buy made a contract binding upon both parties. The provision for fixing the price by appraisal was a valid one, and it was recognized by the act of 1903 which authorized the water board to nominate an appraiser for confirmation by the city council. There was no withdrawal from the appraisal proceedings. The appraisal being valid the Legislature could no more authorize the water board or the city to reject it than it could authorize the abandonment of the contract of purchase itself. Nor can an impairment of the obligation of the city to complete the purchase be effected by prescribing new conditions in respect of the voting of bonds. Sala v. New Orleans, Fed. Cas. No. 12,246, 2 Woods, 188.

The ownership by a city of a waterworks system extending beyond its limits is not an unusual thing. The legislative act in the Kansas City case (Laws Mo. 1873, p. 286, § 1) provided that the city might acquire and use for that purpose property "within and without the corporate limits of the city and also in the state of Kansas," and (section 22) that the city might grant to any person or corporation the right of construction, reserving the privilege of purchase. When the purchase clause was invoked some 20 years later, the company's distribution system extended beyond the city limits and the main supply

works were in another state. The difficulties suggested by counsel here are not greater than those before Mr. Justice Brewer under whose judicial supervision the purchase by the Missouri city was effected. National Waterworks Co. v. Kansas City, 62 Fed. 853, 10 C. C. A. 653, 27 L. R. A. 827; National Waterworks Co. v. Kansas City (C. C.) 65 Fed. 691. In a transaction of this magnitude, there will always be encountered minor obstacles that will readily yield to business methods. What the parties cannot agree upon the trial court has full power to determine according to principles of right and justice. We refer here to such contentions as that there are two or three properties in the city of Omaha belonging to the company but not needed in the business, and also that there are supposed defects in its title to other properties. The latter are not of great importance in comparison with the magnitude of the entire system. The property not needed was appraised separately and it can be excluded from the sale, and the trial court can determine whether the title to other properties is defective. It is not necessary that the title of the company to all the lands upon which its works are built or through which its pipes are laid should be a fee simple, perfect in every particular, and subject to no criticism. An irrevocable license, for instance, would be sufficient, or a title based upon prescription. If, however, there should be found substantial defects, opportunity should be given the company to remedy them, and, if it is unable to do so, the parts of the property so circumstanced can be valued and the purchase price abated accordingly. It would be expressing too narrow a view to say that an appraisal of a great system of waterworks under a contract of purchase must fail because the title to a small part not vital to the integrity of the system was afterwards found to be defective. That the deed tendered by the company was not such as the city was required to take is immaterial. It is sufficient that the company was able, ready, and willing to do what might lawfully be required of it. At some time during the progress of the cause in the trial court the trustees of the mortgages should be made parties, to the end that the precise amount of outstanding bonds may be ascertained and paid and the liens discharged concurrently with payment by the city of the purchase price. Doubtless the company will have to use the proceeds of sale in paying its mortgage indebtedness, or, if an arrangement is desired such as was made in the Kansas City case whereby the mortgages are assumed by the city, and the company released from liability, the presence in the case of the trustees would facilitate it.

The decree is reversed and the cause is remanded, with direction to proceed to decree in accordance with the views expressed in this opinion.