328

E. WAGNER *et al., Respondents,* v. PESHASTIN LUMBER COMPANY *et al., Appellants.*[1]

[1]Reported in 270 Pac. 1032.

*Corbin & Kemp,* for appellants.

*Crollard & O'Connor, Turner, Nuzum & Nuzum,* and *Wakefield & Witherspoon,* for respondents.

MAIN, J.—This action is based upon a written contract. The defendants denied liability and sought affirmative relief. The cause was tried to the court without a jury, and resulted in findings of fact and conclusions of law sustaining a recovery in the sum of $31,826.98, with interest thereon at the rate of six per cent per annum from June 1, 1924. Judgment was entered in favor of the plaintiffs for the sum of $37,-410.49, from which the defendants appeal.

The facts are these: November 14, 1912, a contract was entered into between Marcus D. Wright and wife and Frank Wenz and wife and the Greenough Investment Company, all of Spokane, by which they sold to the Peshastin Lumber Company, one of the appellants in this action, a large tract of timber land in Chelan county. The purchase price was forty thousand dollars. After entering into the contract, the lumber company began logging in the year 1913 and continued to log until the year 1919. The first parties named in the contract later conveyed all their interest in and to the lands described therein to E. Wagner and wife and Otto H. Wagner. They, on December 21, 1921, began an action in the superior court of Chelan county for specific performance, alleging that there was $19,445.-11, or approximately that sum, due on the contract from the lumber company.

Later and during the early part of the year 1923, while that action was still pending, George L. Gardner, representing the plaintiffs in that action and the respondents in the present action, and J. C. Biles, representing the defendants in that action and the appellants in the present action, met in the city of We-

natchee and discussed the matter of settlement. The result was that the parties went to the office of Corbin & Easton, in that city, and further discussed the matter, Mr. Corbin being present representing Mr. Biles and the appellants in this action, and both members of the firm of Crollard & Steiner were present representing plaintiffs in the first action and the respondents in this action. After an agreement had been reached, it was dictated to the stenographer by Mr. Corbin. It was then sent around for all of the parties to sign and this took quite a little time.

The agreement, after reciting the making of the contract of purchase above referred to and describing the land, reciting that a dispute had arisen between the parties with reference to the contract and that the lawsuit was pending, and reciting that the parties were desirous of adjusting the matter out of court and avoiding further litigation, provided:

"Now, therefore, it is agreed between the parties hereto as follows:

"(1) That first parties will pay second parties the sum of Two Dollars ($2) per thousand stumpage for all of the timber cut by them or any of them on the lands above described, the said amount to be determined in the manner hereinafter set out.

"(2) The parties hereto may each select one cruiser to go on the above described land and cruise the same, or, if the parties hereto can agree, they may jointly choose one cruiser to make a cruise of the timber cut thereon, a cruise to be made as hereinafter set out.

"(3) First parties have thirty (30) days from the date of this contract in which to decide which of the above methods of cruising said timber they will choose, and when the choice is made, they shall notify Crollard & Steiner, attorneys for second parties, in writing of their decision.

"(4) In determining what timber was cut by first parties, the cruisers shall consult with parties who were present when the timber was being cut and shall

also take into consideration the appearance of stumps in determining the date when the timber was cut.

"(5) The cruiser or cruisers thus chosen shall go on the above described lands as soon as practicable in the spring of 1923 and make a cruise of the timber cut thereon by first parties; and when said cruise is completed, a report in writing of the findings of the cruisers shall be made and a copy thereof delivered to Corbin & Easton for first parties and a copy to Crollard & Steiner for second parties.

"(6) If there is any dispute between the cruisers selected to make said estimate or between the parties hereto as to the cruise of said timber, the same shall be submitted to A. H. Sylvester of Wenatchee, Washington, and his decision as to said matter shall be final and binding on all of the parties to this contract.

"(7) It is agreed by the parties hereto that first parties cut no timber less than eight (8) inch tops on two-log trees and that it shall not be charged with any timbers or cutting of any logs of smaller dimensions on that part of the lands on which the Peshastin Lumber and Box Company also cut logs.

"(8) It is also agreed that first parties have not operated or cut any timber on any of said lands above described since December 1st, 1919, and that they shall not be charged with any stumpage where the same has been cut since that date.

"(9) It is further agreed that all monies paid by first parties on the principal and interest on said contract dated November 14th, 1912, together with any taxes paid by them on the lands above described, shall be credited on the amount due for stumpage, as found by said cruise.

"(10) All matters of accounting, both in estimating the value of stumpage cut by first parties or any of them and all amounts paid on principal or interest on said contract or taxes on any of said lands by first parties and all monies collected by second parties or any of them or their predecessors in interest for pasturage of lands above described, or any part thereof up to and including the year 1917, shall be submitted to Alfred Gfeller of Wenatchee, Washington, for com-

putation and his decision shall be final on all matters of computation pertaining to the accounting between the parties hereto.

"(11) It is further agreed that, in case the said Alfred Gfeller shall find a balance due from either of the parties to the other, that the debtor party will pay said balance to the creditor party within sixty (60) days after receipt of Gfeller's report, a copy of which shall be delivered to Corbin & Easton and to Crollard & Steiner, and the obligation hereby assumed shall be joint and several obligation of the debtor party or parties.

"(12) The first parties shall estimate as nearly as possible the amount of logs cut by them during each year of their operations on the lands above described, and if on the final cruise it is determined that a greater amount of stumpage has been cut than estimated by first parties, the excess shall be ratably proportioned over the years during which first parties operated on the lands above described; and all balances shall draw interest at the rate of six (6) per cent. per annum from the date of said balance.

"(13) When this contract is carried out, the suit now pending in the Superior Court of Chelan County, Washington, shall be dismissed with prejudice and without costs to either party, but the same shall remain *in statu quo* until this contract is fully complied with or is breached by either of the parties hereto.

"(14) It is agreed that this contract is entered into as a compromise settlement of said suit and that none of the statements herein made shall be construed as an admission of either of the parties to this contract, nor shall they be used in any litigation, either in the suit above referred to or any other suit that may be commenced, unless it be a suit for the specific performance of this contract."

The contract is signed by all the parties, the date thereof being left blank, but it was probably signed sometime during the early part of the year 1923.

After this contract was signed, each of the parties selected one cruiser as paragraph 2 of the contract

provided. There was then executed a supplemental contract, under the title of the action which had been begun, as follows:

"It is here and now stipulated and agreed between the plaintiffs and the defendants, respectively, by and through their counsel of record, that the defendants have chosen ................................ Christey as their representative and that the plaintiffs have chosen ..........Dockery.......... as their representative, to make the cruise of the lands mentioned in plaintiffs' complaint and as described in the contract entered into between the plaintiffs and defendants, for the settlement of the above entitled action on the basis of $2 per thousand stumpage, for all the timber cut by them or any of them on the lands described in said action, and the respective parties to this suit do hereby agree that said cruisers shall go into the field immediately and commence to make their cruise in accordance with the terms of said contract, and prosecute the same with diligence, and should either of said cruisers fail, neglect or refuse to commence said cruise and prosecute the same with diligence, such failure shall not prevent the cruise being completed by the other party and when submitted to A. H. Sylvester, shall be binding upon the other party as though their cruiser had completed said cruise in accordance with the terms of the written agreement therefor. Provided, however, that if the cruisers, or either of them, selected by the parties hereto should be unable to go on and make said cruise, either of the parties shall have the right to immediately select another cruiser who can take up the work at once and prosecute the same with diligence to completion.

"Dated at Wenatchee, Washington, this 13th day of August, 1923.

"Crollard & Steiner, Attorneys for Plaintiffs.

"Corbin & Easton, Attorneys for Defendants."

It will be observed that this contract is signed by the firm names of the attorneys representing the respective parties, Mr. Easton signing for Corbin & Easton and Mr. Crollard for Crollard & Steiner.

After this contract was signed, W. M. Dockery and George W. Christey went upon the land for the purpose of cruising it, the former having been selected by the respondents and the latter by the appellants. The land had already been logged over and it was necessary to make the cruise from the stumps and other data that might be gathered upon the ground. The cruisers entered upon the work and worked together for a period of thirty-four days. From time to time Mr. Dockery sent reports to Crollard & Steiner and Mr. Christey sent reports to the office of Mr. Biles who, owing to his absence, did not receive them until after the cruise had been in progress for the time mentioned. He then went to the place where the cruise was being made, sought out Mr. Christey, criticised him for agreeing to the cruise as the reports indicated, and discharged him. Within a day or two thereafter, Mr. Biles interviewed A. H. Sylvester, who is named in paragraph 6 of the contract to decide any dispute that might arise between the cruisers selected by the respective parties. The result was that Mr. Sylvester indicated that he would not act in deciding such disputes.

Thereafter the appellants refused to do anything further under either the original contract or the supplemental contract, apparently being of the view that the agreement was one of arbitration and not one of appraisement, and that therefore they had a right to repudiate it at any time before the award was made. The respondents, through their counsel, served a written demand upon the appellants that they name another cruiser to take the place of Mr. Christey. No attention was paid to this demand, and Mr. Dockery proceeded to complete the cruise as the supplemental contract provided that he should. After the cruise was completed, the present action was begun based

upon the original contract and also the supplemental contract, with the result above stated.

The first question is whether the contract, which was signed by all the parties, was one of arbitration or appraisement. It will be admitted that, if the contract was one of arbitration, there could be a repudiation of it at any time before an award. If the contract was one of appraisement, it was not subject to repudiation. It appears from the contract that the parties met, discussed and settled every issue then in dispute between them with the exception of one, and that was the quantity of timber which had been removed from the land. The appraisers provided for, and which were thereafter appointed, were to determine this fact and this fact alone.

In *Martin v. Vansant,* 99 Wash. 106, 168 Pac. 990, Ann. Cas. 1918D 1147, after an exhaustive review of the authorities, the distinction between an arbitration and appraisement was pointed out, as follows:

"From the foregoing cases, and many others to the same effect, we think it may fairly be deduced that there is a plain distinction between an agreement to submit an existing controversy or matter in difference between parties to the determination of disinterested third persons mutually chosen for that purpose, and conditions in contracts of larger scope whereby the parties agree in advance and before a dispute has arisen to leave to the decision of appraisers or referees the question of value, price, amount of damage, or other incidental particular fact. In the one case, those making the decision are arbitrators; in the other, they are mere appraisers or referees; the determination of a fact which prevents differences from arising instead of settling controversies which already exist is not an award of arbitrators, properly so called, where the fact to be ascertained is a mere incident of a contract and its settlement by third persons serves to assist the court rather than to oust it of its lawful jurisdiction; and while the naked power of

arbitrators in the proper sense of the term, under contracts purely executory, may be revoked prior to the making of an award, where the submission is not controlled by statute or made a rule of court, the authority of mere valuers or appraisers, after they have been appointed to fix the value of property which already has been bought and sold under the terms of a contract which stipulates as one of its essential provisions that the purchase price shall be so determined, may not be revoked without cause by either party to the transaction.''

In *Cogswell v. Cogswell*, 70 Wash. 178, 126 Pac. 431, it was said:

''The rule is well established that where the contract has been partly performed and is no longer wholly executory, or where the provision for arbitration relates only to a mere incident, such as the arriving at the price of property or the determination of its rental value, the death or failure of the arbitrators to act gives neither party to the contract the right to rescind. In such a case the courts will enforce the contract and will, on evidence, fix the value of the land or determine the rental.'' (Citing authorities.)

The contract in the case now before us, as already stated, settles all of the issues except the quantity of timber removed, and under the cases cited, the means adopted for arriving at this quantity was by appraisement and not by arbitration. The agreement lacks some of the essential features of an arbitration, the investigation of arbitrators being in the nature of a judicial inquiry where the parties have a right to appear before them and be heard. In the case of an appraisement, the appraiser or appraisers are to act by reason of their own knowledge or information which they may acquire and not upon the evidence of witnesses. In *Omaha Water Co. v. City of Omaha*, 162 Fed. 225, it was said:

"But there is a clear distinction between an appraisement by valuers and an arbitration, though the latter term is frequently but incorrectly applied to both proceedings. An arbitration presupposes a controversy or a difference to be tried and decided, and the arbitrators proceed in a judicial way, sometimes as an adjunct to a court of justice. Their investigation is in the nature of a judicial inquiry, and rules of procedure must be strictly observed or their award will be void. On the other hand, an appraisal or valuation is generally a mere auxiliary feature of a contract of sale, the purpose of which is not to adjudicate a controversy but to avoid one."

In *Norton v. Gale*, 95 Ill. 533, it is said:

"But where the office of the party to whom the submission is made is limited to a simple appraisal of value, he is expected to act on his own knowledge and opinions only. And hence, neither evidence of witnesses nor statements of parties or counsel is contemplated."

Under the authorities cited, we are of the opinion that the contract in question was one calling for an appraisement and not one of arbitration. The attempt on the part of Mr. Biles to revoke was ineffectual. The appellants having refused to proceed further after the discharge of Mr. Christey, Mr. Dockery had a right to complete the cruise.

The second question is whether the supplemental agreement signed by the attorneys was binding upon the parties. It will be readily admitted that an attorney without special authority has no right to stipulate away a valuable right of his client. It will also be admitted that, unless there was special authority in this case, the contract signed by the attorneys would not bind the clients. Upon the question as to whether there was special authority, the evidence is directly in dispute. The trial court found that

" . . . the attorneys for the respective parties acted within the scope of their authority in entering into such stipulation."

Without reviewing the evidence, it may be said that we think the trial court's finding on this question should be sustained.

■ The third question relates to the introduction of the two contracts, already mentioned, in evidence and especially the first and principal contract. The appellants objected to this evidence, as it appears from the record, because it was not competent evidence under paragraph 14 of the contract and because the agreement was one of arbitration. The latter question has already been disposed of. The appellants say that this is an action at law for a money judgment, and not one for specific performance, and therefore the respondents had no right to rely upon the contract. It will be observed that paragraph 14 of the contract provides that

" . . . this contract is entered into as a compromise settlement of said suit and that none of the statements herein made shall be construed as an admission of either of the parties to this contract, nor shall they be used in any litigation, either in the suit above referred to or any other suit that may be commenced, unless it be a suit for the specific performance of this contract."

There is some discussion as to whether the present action is one at law or in equity, but this does not reach the question. If the strict terms of the contract are to be applied, and this is not an action for specific performance, then the contract by its own terms forbids its use.

■ The fact that a money judgment is sought does not necessarily mean that the action is not one in equity for specific performance. Whether the action is one of specific performance depends upon whether

that remedy is mutual. If it is available to one of the parties it is to the other. Had the present action been begun by the appellants to enforce paragraph 13 of the contract, which provided that the suit then pending in the superior court of Chelan county should be dismissed, it seems plain that the action would have been one of specific performance, as that was a thing to be done which could not be accomplished in any other form of action. In Pomeroy's Specific Performance of Contracts (3d ed.), § 165, it is said:

"Mutuality in the equitable remedy is so essential that the converse of the proposition above stated is well established, and it is a familiar doctrine that if the right to the specific performance of a contract exists at all, it must be mutual; the remedy must be alike attainable by both parties to the agreement. For this reason the purchaser's obligation in a contract for the sale of land, although nothing more, perhaps, than a liability to pay a certain sum of money, may always be enforced by a suit in equity on behalf of the vendor, since the purchaser may, in the same manner, obtain the performance of the vendor's duty to convey. . . . ."

The cases of *Morgan v. Bell*, 3 Wash. 554, 28 Pac. 925, 16 L. R. A. 614, and *Peters v. Van Horn*, 37 Wash. 550, 79 Pac. 1110, are not out. of harmony with that rule. In each of those cases it was held that an action for specific performance of a contract to convey real property will not lie in favor of one who knows prior to the commencement of such action that defendant is incapable of performing the contract for want of title. The doctrine of those cases is not applicable to the facts of the case now before us.

If the respondents did not have a right to introduce the contract in evidence, when the action was based thereon, it is a little difficult to see what rights they got by virtue thereof. If the action be not one for spe-

cific performance, as the appellants claim, then, even though the cruise agreed upon show that they were entitled to recover, they would have no way of availing themselves of what they had contracted for. It seems to us that the parties must have used the words specific performance of the contract in the sense that if an action be based thereon. However, according to the doctrine of the text by Pomeroy, above cited, the action, even though a money judgment was sought, was in effect one for specific performance. There was no error in the admission of the contract in evidence. As to the supplemental contract, it was likewise properly received. As already found, the attorneys signing the same acted within express authority and it was binding upon the parties.

The fourth question is whether the cruise, as performed by the cruisers up to the time Mr. Christey was discharged and after that by Mr. Dockery, was padded, false or fraudulent. This presents distinctly a question of fact. The evidence is voluminous and somewhat technical. Time and diligent attention have been given to the evidence, but it is obvious that it is impossible in an opinion to review it in detail. The appellants' principal contentions upon this question are that the volume table used by Mr. Dockery and Mr. Christey up to the time Mr. Christey was discharged, and after that by Mr. Dockery, was incorrect, and that stumps were counted which should not have been counted.

A volume table is based upon the average tree of any particular diameter. For example, a tree with a butt diameter of eighteen inches and a top diameter of eight inches would have a taper indicated by the difference between the diameter of its base and of its top. The volume table used in the cruise was prepared by Mr. Dockery, as he says, with the assistance

of Mr. Christey after they went upon the ground. The chief objection to it is that it does not show a sufficient taper of the trees, and therefore shows an excessive amount of timber removed.

Much is said in the briefs with reference to what has been called the volume table used by the Federal government. This was prepared as a combination of the Austin, Oregon, and the Looking Glass Creek, Oregon, volume tables and was based upon something like fifteen hundred felled trees grown under average conditions in northeastern Oregon. That table shows the taper to be substantially greater than the volume table used by Mr. Dockery.

The evidence of Mr. Dockery, and also one of the experts called by the appellants, was that a man cruising a cut-over area has to make up his own volume table and must use his own judgment and arrive at something he thinks would give the average of the various trees removed. This is because the height and the taper of a tree is influenced by the character of the soil in which it grows, the atmospheric conditions and the proximity in which it grows to other trees. The testimony is that, while the Federal government sells timber according to its volume table, the logs must be paid for as they are scaled.

Upon all the questions with reference to the cruise, the evidence is conflicting. There was some evidence which corroborated Mr. Dockery. Mr. Christey as a witness attempted to impeach the cruise which he and Mr. Dockery had made, as well as the cruise that Mr. Dockery had made after Mr. Christey ceased to work with him. There was other evidence of experts who had gone on the ground for investigation who testified, and their testimony would tend to support the contention of the appellants. Mr. Dockery was not acquainted, at the time he was selected, with any of the

parties. The respondents, after the contract was signed, communicated with a firm of timber cruisers in Portland and asked them to send a cruiser and they sent Mr. Dockery. He was a man of long and wide experience in that work. There was no reason why he should desire to favor either of the parties. In fact, it may be said that, after an attentive consideration of all the evidence, we are of the opinion that Mr. Dockery was a capable, fair-minded and honest cruiser. The trial court upon this question found that:

"The cruise of said lands, including the joint cruise of a portion thereof made by said Christey and Dockery, and the cruise of the remaining land by said Dockery, was made carefully and in good faith and according to the best judgment of the cruisers, and was in no respect padded, false or fraudulent."

After giving consideration to all of the testimony and the exhibits, we are of the opinion that the finding of the trial court should be sustained.

The judgment will be affirmed.

FULLERTON, C. J., ASKREN, BEALS, and HOLCOMB, JJ., concur.