[No. 38801.     Department Two.     July 27, 1967.]

THE CITY OF BREMERTON, *Respondent*, v. KITSAP COUNTY SEWER DISTRICT, *Appellant*.*

*Reported in 430 P.2d 956.

*Niemeier & Hamilton, E. A. Niemeier,* and *C. Conrad Green,* for appellant.

*Gerard N. Fisher,* for respondent.

BARNETT, J.†—In the 1940's the Washington State Pollution Commission required the respondent city of Bremerton (hereinafter referred to as "the city"), to build a sewage treatment plant and make other improvements to its sewage system. The ultimate cost of these improvements, as far as this case is concerned, was $1,214,735.41. Of this sum the state of Washington provided in matching funds the amount of $466,350.35; the United States Navy provided $100,000.31; and Local Improvement District No. 229 added $14,319.82. The remainder of the cost, $634,064.93, was the obligation of the city to provide. The city issued water and sewage revenue bonds and made other appropriations as their part in the financing arrangement.

On February 15, 1950, the city and appellant Kitsap County Sewer District No. 1 (hereinafter referred to as

---

†Judge Barnett is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

"the district"), contracted with each other for the stated objective of "eliminating pollution of the waters of Sinclair Inlet and Puget Sound." The objective was to be attained by an "adequate disposal of sewage" by the two municipal corporations. To this end it was agreed that the city would build a sewage disposal plant for the parties' joint use.

The text of the contract will be quoted in its entirety since this appeal raises as an issue its proper interpretation.

AGREEMENT

THIS AGREEMENT, Made and entered into this 15th day of February, 1950, by and between the CITY OF BREMERTON, a municipal corporation of the first class of the State of Washington, hereinafter called "City," and KITSAP COUNTY SEWER DISTRICT No. 1, hereinafter called "District," WITNESSETH:

WHEREAS, the City is presently engaged in the construction of the West Side Sewer and Disposal Unit and the District owns and operates a sewer system situated in an area known and described as Navy Yard City and does not own or maintain a sewage disposal plant, and both parties to this agreement are desirous of eliminating pollution of the waters of Sinclair Inlet and Puget Sound by adequate disposal of sewage, and in order to attain the joint objective the parties hereto do hereby AGREE as follows:

1. That the City shall construct a sewage disposal plant for the joint use of the City and the District and in connection therewith shall erect two pumping stations known and described as Pumping Stations 8 and 9, which pumping stations shall be located near and connected with the outfalls and comminutors of the District at Webster and Nebraska Avenues in the Plat of Navy Yard City. The City shall construct at its own cost, the necessary pumping plants, together with the pipe, pipeline, and necessary equipment, and thereafter, at its own cost, shall maintain, operate, repair and replace the said pumping stations and necessary equipment therein or used in connection with the operation thereof, for the joint use of the parties hereto.

2. The District agrees to give such easements as it may have power to do for the purpose of connecting the lines of the District to the pumping plants and the sewage disposal line owned by the City and shall, when able

or permitted, convey to the City the comminutors now owned by the District which, until their conveyance to the City of Bremerton, shall be maintained and operated by the City.

3. It is understood and agreed that the proportion of the cost which should be assigned to the District for the erection of said pumping plant and the sewage disposal system, is 9.38% thereof, and that in order to pay such costs of the construction and thereafter the maintenance, operation, replacement and repair of the system, each water and sewer user located within Kitsap County Sewer District No. 1 shall pay the sum of fifty cents (50¢) per month which shall be added to the water charge made by the City to each resident within the District, and which shall be billed as a part of the monthly water rate to each user, during the time that the Revenue Bonds for the construction of such system are outstanding and unpaid. In addition thereto, the District agrees to collect and pay to the City the sum of fifty cents (50¢) per month from each user connected to and using its sewer lines and to certify to the City Treasurer of the City each month the number of users so connected to the lines of the District. Remittance for the monthly charge shall be made by the District to the City at the time of collection thereof in accordance with the regular billing and collection period established by the District. The District shall guarantee the collection of the fifty cent (50¢) charge from each of its users by the use of all collection procedures provided by law therefor to said District.

4. This agreement for the collection of monthly charges by the District shall continue for a period of two (2) years from the date of the connection of the lines of the Sewer District to the pumping plants and sewage disposal system, and thereafter, while the City's Revenue Bonds for the construction of said plant are outstanding and unpaid, until the District shall close its collection office. On the date of these which shall sooner occur, the City and the District shall make other equitable arrangements for the collection of the fifty cents (50¢) per month charged to the users of the District lines. The period of two (2) years mentioned herein is upon the understanding that the District expects to pay off its indebtedness within that period and will thereafter close its present collection office, and that after the closing of

the collection office the District and the City will enter into an equitable arrangement and agreement so that collection maybe [sic] made by and through the City.

5. In the event of the annexation of the area embraced within the District by the City, this agreement shall terminate. It is further agreed and understood that under the present financing of the Sewage Disposal System by the City that the period of twenty-four (24) years will be required for its liquidation and the payment of bonds issued for its construction, and this agreement shall continue for the full time necessary to pay off all indebtedness of the system unless prior to that time the area within the District shall be annexed by the City or the District shall dissolve.

6. It is understood and agreed that the District has heretofore pledged the revenues of the District's sewer system to guarantee the payment of Sewer Revenue Bonds sold for the cost of acquisition of said system and that said revenue bonds constitute a first and paramount lien against said sewer system and the revenues thereof and that all payments and charges provided for herein are inferior and subject to said revenue bonds. And that so long as any of said revenue bonds are outstanding and unpaid, the District shall not be required to make any payments to the City or to take any action whatsoever in the collection of the charges provided for herein, which would in any manner impair or reduce the security of the revenue bonds heretofore issued by said District.

Under the terms of the contract the district collected and paid over to the city the 50 cents per month charge made to the customers connected to the district's sewer lines until April 1, 1962, at which time the district discontinued making payments to the city. The city thereafter brought suit to enforce the agreement.

The trial court found that one of the means of payment in the agreement, the provision for 50 cents per month to be added by the city to the water bill of each resident in the defendant district (the city operated the water system in the sewer district area), was beyond the power of the city to enforce. It is noted that neither of the parties operated under this provision. There has been no challenge to this particular finding; therefore, it is incontestable now.

The trial court did, however, give effect to the balance of the contract, ruling that the district was obligated to collect 50 cents per month from each user connected to its sewer lines and pay the collected amounts over to the city until the revenue bonds issued by the city were paid off or until other agreed upon events might occur which would then terminate the district's contractual obligations. The following findings of fact are the essence of the judgment of the trial court.

### III

That on or about February 15, 1950, plaintiff and defendant entered into a contract called "Agreement" wherein and whereby in consideration of plaintiff constructing a larger sewage disposal plant than was necessary for its needs and appurtenant connections, pumping station, and system, and to finance the same in part by the issuance of revenue bonds of plaintiff for the costs of construction and installation, said bonds to run for a period of approximately 24 years from the issuance thereof, being after the 15th day of February, 1950. The said defendant agreed to collect and pay plaintiff the sum of Fifty Cents per month from each user of defendant's sewer facilities connected to and using defendant's sewer line and to certify to the City Treasurer of the City each month the number of users so connected to the lines of the district, and to remit said monthly charge at the time of collection thereof in accordance with regular billing and the collection period established by the district. Said defendant District guaranteed the collection of Fifty Cent charge aforesaid from each of its users by the use of all collection procedures provided by law therefore to said defendant District, and that said monthly charge would continue for a period commencing with the date of the connection of the lines of the sewer district to the pumping plant and sewage disposal system and continue thereafter while the city's revenue bonds for the construction of said plant and facilities were outstanding and unpaid, and until defendant District had paid off its own indebtedness on prior obligations. Said Fifty Cent charge was to discontinue upon annexation of the area embraced by the district by plaintiff City, or upon the financing revenue bonds for the sewage disposal system issued by the city were paid.

.  .  .  .

## VII

[A]nd the second charge of Fifty Cents per user, referred to in said Paragraph 3 of said agreement was for both the cost of the system and also for maintenance, operation, repair and replacement thereof.

. . . .

## IX

That the users connected to and using the defendant district's facilities are solely within the knowledge of defendant District. The Defendant District is required by its agreement with plaintiff City to certify to plaintiff the number of users, in addition to the users represented by the collections to August 31, 1965, commencing with the 1st day of September, 1965, and pay to plaintiff a sum equal to the number of such users multiplied by Fifty Cents thereafter and until the revenue bonds issued for construction of said system set forth in said agreement are paid.

There are also involved in this appeal circumstances and legal questions entirely unrelated to the questions involving the contract between the parties. This second controversy was raised in a cross-complaint by the district against the city. The facts will be related as we meet the issues directly.

On this appeal the appellant district presents two broad arguments supporting its contention that it should not have to continue to collect and pay over moneys to the city under the contract. One argument is a challenge to the validity of the agreement itself, and the other is that the trial court improperly interpreted the contract in deciding that the district's contractual obligations were to continue until such time as the city's revenue bonds were fully repaid, or the district was annexed by the city. The district has two prongs to its argument of invalidity of the contract. The first issue to be resolved is whether or not the contract created a general indebtedness which would have required prior approval by the voters of the district to be valid. Laws of 1941, ch. 210, § 17, p. 647 (now RCW 56.16.030) is the statute applicable at the time the contract was entered into, and it states:

In the same manner as herein provided for the adoption and ratification of the original comprehensive scheme, and after the adoption of the original comprehensive scheme, a plan providing for additions and betterments to the original comprehensive scheme may be adopted and ratified. The sewer district may incur a general indebtedness for the construction of the additions and betterments in the same way the general indebtedness may be incurred for the construction of the original comprehensive scheme after submission to the voters of the entire district in the manner the original proposition to incur indebtedness may be submitted.

There is general statutory authority for sewer districts to enter into an arrangement for joint use of sewage facilities with other municipal corporations. Laws of 1941, ch. 210, § 48, p. 667, in effect at the time the contract was entered into, provided that

Wherever economies in providing sewerage service may be affected by joint use of sewer lines, trunks, interceptors, siphons, pumping stations, treatment plants or other appurtenances, contracts may be entered into between the sewer district and any other corporate entity for the joint use of these facilities. (Now RCW 56.08.060 as amended.)

Furthermore, Laws of 1947, ch. 212, § 3, p. 895 stated that

Any city, town or organized and established sewer district owning or operating its own sewer system, whenever topographic conditions shall make it feasible and whenever such existing sewer system shall be adequate therefor in view of the sewerage and drainage requirements of the property in such city, town or sewer district, served or to be served by such system, may contract with any other city, town or organized and established sewer district for the discharge into its sewer system of sewage from all or any part or parts of such other city, town or sewer district upon such terms and conditions and for such periods of time as may be deemed reasonable.

Any city, town or organized and established sewer district may contract with any other city, town or organized and established sewer district for the construction and or operation of any sewer or sewage disposal facilities for the joint use and benefit of the contracting parties upon

such terms and conditions and for such period of time as the governing bodies of the contracting parties may determine. Any such contract may provide that the responsibility for the management of the construction and or maintenance and operation of any sewer disposal facilities or part thereof covered by such contract shall be vested solely in one of the contracting parties, with the other party or parties thereto paying to the managing party such portion of the expenses thereof as shall be agreed upon.

These statutes allow the district to contract as it did in this case and to pay to another party as the managing party a portion of the expenses. We are not convinced that the contract created a general indebtedness of the sewer district thereby requiring a vote of its residents. There is only one case cited in support of the district's proposition that the contract created an indebtedness on its part, *Edwards v. Renton*, 67 Wn.2d 598, 409 P.2d 153 (1965). After a perusal of the *Edwards* case we find that it has absolutely no applicability to the case at hand. In the *Edwards* case, *supra*, we held that a second class city had no inherent power to borrow money nor could such power be inferred or implied from the statutory authority to contract or incur indebtedness. In the present case, however, we are not concerned with the authority of the district to act for it had the power to contract with the city for joint use of sewage facilities, see the statutes cited above, and it had statutory authority to make the charges necessary for the operation of its sewer system, Laws of 1945, ch. 140, § 9, p. 382 (now RCW 56.08.010). We are only concerned with whether or not the contract created an indebtedness.

■ Looking at the contract we find that the district did not borrow any money nor pledge any credit in its arrangement with the city. There is no indication that the district was obligated on the revenue bonds issued by the city. It was the residents of the district connected to the sewer lines who were to pay the monthly charge and the district merely agreed to act as an intermediary to collect the charge from the sewer users and transmit the amounts collected to the city. Other than the contractual obligation

to collect the monthly charge and pay over to the city, there is no liability on the part of the district, therefore, there is no general indebtedness. 64 C.J.S. *Municipal Corporations* § 1853 (1950). Since no indebtedness was created the agreement is not invalid as a means of creating a general indebtedness of the district without a vote of the residents of the district.

The district's second argument for invalidity is that the contract is written with a time period which is uncertain, therefore, argues the district, such time period is unreasonable and it makes the contract unenforceable.

■ We view this argument in light of general considerations for contract construction. The following quotation is particularly applicable to the present circumstances and we entirely agree with it.

> The determination that an agreement is sufficiently definite is favored. Therefore, the courts will, if possible, so construe the agreement as to carry into effect the reasonable intention of the parties, if that can be ascertained. The law leans against the destruction of contracts for uncertainty, particularly where one of the parties has performed his part of the contract. 17 Am. Jur. 2d *Contracts* § 75 (1964).

The trial court found that the 50 cent charge was to continue until the revenue bonds issued by the city were paid or the sewer district was annexed by the city. The contract stated:

> It is further agreed and understood that under the present financing of the Sewage Disposal System by the City that the period of twenty-four (24) years will be required for its liquidation and the payment of bonds issued for its construction, and this agreement shall continue for the full time necessary to pay off all indebtedness of the system . . . .

■ We start from the rule that "In the absence of an affirmative showing of unreasonableness, the contract is *prima facie* valid." *Municipality of Metropolitan Seattle v. Seattle,* 57 Wn.2d 446, 460, 357 P.2d 863 (1960). We are not presented with any showing that the time period determined by the trial court is not "reasonable in view of the

nature of the subject matter." *Washington Fruit & Produce Co. v. Yakima,* 3 Wn.2d 152, 163, 100 P.2d 8, 103 P.2d 1106, 128 A.L.R. 159 (1940). The contract was for the joint use of the new disposal facilities with the district agreeing to collect and pay over the monthly charge imposed upon its resident users in return for its right to use the facilities. Since the use will continue over a long period of time it is not unreasonable to find that the payments also should continue over an extended period of time. The term is definite in that the contractual obligations of the district will end when the city's revenue bonds are paid off or the district is annexed by the city. The contract stated that the length of the payment period for the bonds was 24 years. The record is void of any facts which indicate that this admittedly tentative period is grossly misstated. There is no affirmative showing by the district of unreasonableness of the terms of the contract. We hold that under the facts of this case the ruling of the trial court enforcing the contract was correct.

The district's other attack on the trial court's determination is that the contract was not properly interpreted. The trial court found that the district was to continue to make collections and turn over the sums collected to the city until the city's revenue bonds were paid off or until the district is annexed and that these payments by the sewer users in the district were not only to compensate the city for constructing the disposal system, but also to pay for operation and maintenance. The district suggests that such an interpretation of the contract is inconsistent with other language of the contract and that it is unreasonable.

█ The general rules of contract interpretation are well known and settled. We repeat those basic considerations as we stated them in *Dickson v. Hausman,* 68 Wn.2d 368, 370, 413 P.2d 378 (1966).

> In ascertaining the intention of the parties to a written instrument, the courts must look to the wording of the instrument itself as made by the parties, view it as a whole, and consider all of the circumstances surrounding the transaction together with the interpretation of the

instrument by the parties themselves as indicated by their subsequent acts. [Citing case.] *Clements v. Olsen,* 46 Wn.2d 445, 449, 282 P.2d 266 (1955).

*Accord, In re Garrity's Estate,* 22 Wn.2d 391, 156 P.2d 217 (1945), and *Burch v. Rice,* 37 Wn.2d 185, 222 P.2d 847 (1950).

The primary factor to be considered in determining the meaning of a written contract is the *intention of the parties,* and that intention normally is to be ascertained largely from the language employed by them. [Citing case.]

Where the terms of a contract taken as a whole are plain and unambiguous, the meaning of the contract is to be deduced from its language alone, and it is unnecessary for a court to resort to any aids to construction. [Citing cases.] But where the language of a contract is ambiguous or susceptible of more than one meaning, it is the duty of the court to search out the intent of the parties by viewing the contract as a whole and considering all of the circumstances surrounding the transaction, including the subject-matter and the subsequent acts of the parties. [Citing cases.] *Boeing Airplane Co., v. Firemen's Fund Indem. Co.,* 44 Wn.2d 488, 496, 268 P.2d 654, 45 A.L.R.2d 984 (1954).

We deem it desirable to point out that neither in the contract nor elsewhere in the record is it indicated which party drew up the instrument.

The contract is ambiguous and it is the court's duty to properly resolve this problem of interpretation. The objective is to determine what the parties intended which must be found from the language of the agreement due to the paucity of extrinsic evidence in the record on this matter. It is our opinion that at the time the agreement was entered into the parties did not intend that the cost to be assigned to the users in the district be only limited to a portion of the construction costs. The district bases this interpretation on specific language in the contract which is ambiguous and is inconsistent with other portions of the contract. It is pointed out in the district's brief that the contract in paragraph one states:

The City shall construct at its own cost, the necessary pumping plants, together with the pipe, pipeline, and

necessary equipment, and thereafter, at its own cost, shall maintain, operate, repair and replace the said pumping stations and necessary equipment therein or used in connection with the operation thereof, for the joint use of the parties hereto.

Paragraph three states in part:

It is understood and agreed that the proportion of the cost which should be assigned to the District for the erection of said pumping plant and the sewage disposal system, is 9.38% thereof, . . . .

However, when one reads the contract as a whole a purpose is stated that the inconsistencies of the agreement do not destroy; in fact, if this inconsistent and ambiguous language were to be given effect as urged by the district, the expressed intentions of the parties would be severely limited. The rest of the sentence in paragraph three begun above, reads:

[A]nd that in order to pay such costs of the construction *and thereafter the maintenance, operation, replacement and repair of the system,* each water and sewer user located within Kitsap County Sewer District No. 1 shall pay the sum of fifty cents (50¢) per month which shall be added to the water charge made by the City to each resident within the District, and which shall be billed as a part of the monthly water rate to each user, during the time that the Revenue Bonds for the construction of such system are outstanding and unpaid. (Italics ours.)

Although the charge to be billed by the city to the residents of the district was held to be invalid we find that this portion of the contract indicates that the parties intended that the users residing in the district would help pay for construction and for *maintenance, operation and repairs.* It does not follow from the fact that the charge is invalid that the stated purpose of the charge is also to be deleted from the contract.

The district also urges that it should only pay 9.38 per cent of the cost of pumping plants and disposal system. But to decide that that is the extent of the district's obligation would nullify the provisions to the effect that the district would be contractually obligated until the city's revenue

bonds were paid off or until the district was annexed. The instrument reads, "[T]his agreement shall continue for the full time necessary to pay off all indebtedness of the system . . . ." This provision supports the expressed intention that the district was to pay for maintenance, operation and repairs as they can occur only over a period of time and it is over a period of time that the defendant and its resident sewer users gain the benefit of the agreement.

The cross claim by the defendant arises from facts entirely unrelated to those involving the contract above discussed. The city of Bremerton operates its water system beyond its own boundaries. It happens to supply the water in the area of the appellant sewage district and the district is one of its customers. In 1963 the city, under the authority of an ordinance, installed new water pipes outside its municipal boundaries to supersede old pipes to which the district was connected. Six-inch cast-iron mains were used to supersede the existing one and one-half to two-inch pipes. The district claimed that its water supply by the old pipes was adequate and refused to pay a charge in the amount of $186.18 made by the city to defray the cost of the new mains. The total was computed on a rate of $2.75 per front foot charge to customers outside the city. The city cut off the water supply to the district's building. The district made this cross claim for damages resulting from its loss of water, but at the trial it waived its claim for damages and only asked that its water service be resumed. The trial court in its conclusions of law stated that

> [T]he City acted within its power and authority to terminate the service through . . . [the former] water pipe system, replace the same and to require payment of front footage charge of $186.00 before connecting defendants [*sic*] community building to the water supply system as newly installed.

The district appeals from this adverse decision of the trial court. It bases its appeal on three different grounds which we will consider in the order presented by the district.

The district's first argument is that the city did not have authority to replace water lines outside its limits. Finding of

fact No. 12 states "That plaintiff Water Department owned all of the pipes and water supply system within the defendant District, having acquired the same by purchase and grant over the prior years." Although the district assigns error to this finding of fact it does not argue that there is no evidence to support the above-quoted portion, hence we will accept the ownership as established.

The language of the Laws of 1959, ch. 90, § 6, p. 533 (effective at the time the new pipes were installed) leaves us no doubt that the city can operate and maintain the water service outside its boundaries and make the necessary charges for the service and costs of replacement. We quote from that statute:

> A city or town may construct, condemn and purchase, purchase, acquire, add to, maintain, and operate waterworks, within or without its limits, for the purpose of furnishing the city and its inhabitants, and any other persons, with an ample supply of water for all purposes, public and private, including water power and other power derived therefrom, with full power to regulate and control the use, distribution, and price thereof: *Provided,* That the rates charged must be uniform for the same class of customers or service. In classifying customers served or service furnished, the city or town governing body may in its discretion consider any or all of the following factors: The difference in cost of service to the various customers; location of the various customers within and without the city or town; the difference in cost of maintenance, operation, repair, and replacement of the various parts of the system; . . . .

It was decided in *Spear v. Bremerton,* 90 Wash. 507, 156 Pac. 825 (1916), under an earlier version of the above-cited statute, that a city could sell water outside its own boundaries. But the district urges that the *Spear* case, *supra,* is authority for its contention that the city did not have any authority for repairing the water lines outside its corporate boundaries. We cannot agree with such an interpretation of the *Spear* case, *supra.* We merely held in that case that there was no statutory authority for "one city to take over a [water] distributing system in another *city.*" (Italics ours.) *Spear v. Bremerton, supra,* at 511. We find the cited

statute permits the city's ownership of the water system in the sewer district area and that the city was empowered to make the replacements to the water line and charge therefor.

■ Next, argues the district, there was no necessity for the new water mains. Inquiry into the propriety of a determination of necessity is beyond our realm without assertions of fraud or bad faith, which the district does not make in this appeal. In *Blade v. Town of LaConner,* 167 Wash. 403, 407, 9 P.2d 381 (1932) we said:

> It is well settled that a court of equity will not review the action of the legislative authority of a municipality as to such matters as rest within its discretion, unless fraud or bad faith are shown, or unless the action taken is clearly ultra vires.
>
> "This discretion, where it is conferred or exists, cannot be judicially interfered with or questioned except where the power is exceeded or fraud is imputed and shown, or there is a manifest invasion of private rights. Thus, where the law or charter confers upon the *city council, or local legislature, power to determine upon the expediency or necessity of measures relating to the local government,* their judgment upon matters thus committed to them, while acting within the scope of their authority, cannot be controlled by the courts. In such case the decision of the proper corporate body is, in the absence of fraud, final and conclusive, unless they transcend their powers." 1 Dillon on Municipal Corporations (5th Ed.), p. 457-8.

The city, by statute, had "full power to regulate and control the use, distribution, and price" of its water service. Laws of 1959, ch. 90, § 6, p. 533.

■ Finally, the district argues that the rates for putting in the new water lines are discriminatory and unreasonable. It states, "Although cities may be permitted to discriminate in the rate of a water charge to non-resident users as opposed to resident users, the same is not true of the charge for costs of replacements. Such a charge must be based upon and related to the reasonable cost of said replacement." However, the district has cited no authority for

the proposition that there can be no discrimination in rates charged for replacement expenses.

> Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none. Courts ordinarily will not give consideration to such errors unless it is apparent without further research that the assignments of error presented are well taken. *DeHeer v. Seattle Post-Intelligencer,* 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

As to the second phase of this argument, the charge for replacement being unreasonable, the trial court found that the charge was reasonable and commensurate with costs. We feel the record supports this finding.

The judgment is affirmed.

FINLEY, C. J., HILL, HUNTER, and HAMILTON, JJ., concur.