[No. 159-40659-2.    Division Two.    September 4, 1970.]

EAGLE INSURANCE COMPANY, *Respondent*, v. ANN ALBRIGHT, *as Administratrix, Appellant.*

*Orvin H. Messegee* and *Jeremiah H. McCormick,* for appellant.

*Devin, Hutchinson & Peterson* and *Laird B. Peterson,* for respondent.

PEARSON, J.—Defendant[1] appeals from a judgment entered on the verdict of a jury awarding plaintiff, Eagle Insurance Company, $88,682.45 for insurance premiums allegedly owing it.

The defendant, Lester P. Albright, had been general agent for plaintiff insurance company[2] for the states of Washington and Oregon since August 2, 1963. The agency was formally terminated by the company on September 1, 1966. This action was commenced on September 21, 1966. Plaintiff's complaint alleged that Albright was indebted to it for a sum in excess of $106,000 for insurance premiums. Plaintiff also moved for the appointment of a receiver to take charge of the business and for a restraining order to prevent the destruction of business records.

On September 29, 1966 an amended complaint was filed, seeking an accounting of the premiums owed to it and praying for judgment in the amount the accounting showed to be due. Filed with the amended complaint was a stipulation signed by both parties on September 29, 1966. The stipulation provided for the dismissal of the receivership application, and in part provided:

1. They, and each of them, do hereby appoint Sam Patterson (presently accountant for said defendant) *as agent for collection of current and past due premiums.*

2. They, and each of them, do hereby appoint the said Sam Patterson to ascertain within the reasonable foreseeable future the premiums *payable by said defendant to said plaintiff which would necessarily include the ascertaining of the premiums receivable from the subagents*

---

[1] The original defendant, Lester P. Albright, died subsequent to the trial of this cause and his estate was substituted as defendant. During the term of his agency he did business as Surplus Insurance Factors.

[2] Plaintiff was a licensed surplus insurer, exclusively marketing "high risk" automobile casualty insurance.

*of said defendant and the assureds,* insofar as said premium receivables relate to the business of said plaintiff. Upon the ascertainment of said premiums payable, the prayer of plaintiff's Complaint shall be deemed amended to said figure and the said defendant will admit and, by these presents, does admit that said amount is due and payable to said plaintiff without further proof thereof. The said plaintiff is authorized to take judgment in said amount on its attorney's affidavit on three days' notice. It is expressly understood that any grievances unrelated directly to said premiums payable account are reserved to said defendant notwithstanding anything in this agreement.

(Italics ours.) A formal order was entered on September 30, 1966, dismissing the application for a receiver.

On March 20, 1967, plaintiff moved for judgment of $90,061.31, based on an accounting rendered by Patterson affirming that such amount was due in accordance with the terms of the stipulation. Defendant opposed the motion, claiming that Patterson's accounting had not complied with the terms of the stipulation. At this stage of the proceedings the real dispute between the parties became evident. Did the agency agreement (exhibit 12) create a debtor-creditor relationship between the parties for the amount of all premiums (less commissions) immediately upon the issuance of policies by the defendant, or did the agreement make defendant liable to plaintiff only for premiums (less commissions) actually collected by defendant from the subagents? It is not disputed that the accounting done by Patterson was premised on defendant's liability to plaintiff for uncollected as well as for collected premiums.

The portion of the agency agreement relevant to this appeal provided:

It Is HEREBY AGREED between the Company and the Agent as follows:

(1) Agent has full power and authority to receive and accept proposals for insurance covering such classes of risks as the Company may, from time to time, authorize to be insured; to collect, receive and receipt for premiums on insurance tendered by the Agent to and accepted by the Company and to retain out of premiums so collected,

as full compensation on business so placed with the Company, commissions as may be from time to time mutually agreed upon.

It is a condition of this Agreement that the Agent shall refund ratably to the Company, on business heretofore or hereafter written, commissions on cancelled liability and on reductions in premiums at the same rate at which such commissions were originally retained.

(2) In the event of termination of this Agreement, the Agent having promptly accounted for and paid over premiums for which he may be liable, the Agent's records, use and control of expirations shall remain the property of the Agent and be left in his undisputed possession; otherwise the records, use and control of expirations shall be vested in the Company.

(3) The Agent agrees to hold all premiums and return premiums collected as a fiduciary trust, until payment shall have been made to the Company, or in case of return premiums, to the insured. Accounts of money due the Company on the business placed by the Agent with the Company are to be rendered monthly so as to reach the Company's office not later than the 15th day of the following month; the balance therein shown to be due to the Company shall be paid not later than 45 days after the end of the month for which the account is rendered.

The motion for judgment was heard by Judge Frank James[3], who treated it as a motion for summary judgment (CR 56), which could only be granted if there was no genuine issue as to any material fact. Judge James ruled that both the stipulation and the agency agreement were ambiguous as they pertained to defendant's liability to plaintiff for uncollected insurance premiums. Accordingly, the motion for judgment was denied and the matter set for trial on the issue of defendant's liability under the stipulation. Defendant was required to answer the amended complaint.

Defendant's answer, filed June 14, 1967, denied liability for uncollected premiums and asserted that Patterson's accounting had improperly charged him with such. Defend-

---

[3]Judge James was at that time Superior Court Judge for King County. He is now Chief Judge, Division I, Washington Court of Appeals.

ant also affirmatively asserted that Patterson, at plaintiff's direction, failed and refused to audit and collect past-due accounts. Defendant also cross-complained, claiming that plaintiff had breached the agency agreement by effecting mass cancellations of its policies and by encouraging subagents and insureds to refuse payment of past-due premiums. The cross complaint also claimed that in July, 1966 the parties agreed that all past-due indebtedness would be compromised for $20,000, which sum was paid by defendant; and that such agreement further provided that plaintiff would advance $2,500 to help defray the expenses of collection of past-due premiums and at the end of 4 months an additional $2,500 would be advanced if an examination of the accounts showed that defendant was not further behind in collections. Defendant alleged that this subsequent agreement was breached when plaintiff summarily terminated the agency within 2 months and instructed the subagents not to make any payments to the defendant. Damages in the sum of $500,000 were claimed.

On October 9 and 10, 1967 Judge Story Birdseye heard testimony limited solely to the issue of defendant's liability under the stipulation. This hearing largely involved testimony by Patterson and another accountant, Moore, who testified as to what they did in arriving at the amount due under the stipulation and to the accounting practice of the parties. Patterson testified that it was not practical for him to audit the older accounts receivable (prior to January, 1966) because of the time and expense involved and that plaintiff had instructed him not to do so.

Judge Birdseye denied plaintiff's motion for judgment, stating in part:

It is clear that they [both parties] contemplated the determination of a net figure, after these accounts receivable had been wrung out, somehow or other.

The stipulation does not authorize the Court to enter judgment for the gross amount due.

Judge Birdseye also released the parties from the stipu-

lation, believing that it could not be performed because of the impracticality of requiring Patterson to audit the older accounts. In attempting to put the parties in the same position they were before the stipulation was entered into, the court reinstated the receivership application by vacating the order of September 30, 1966 which had dismissed such application. Defendant's subsequent motion to vacate this order or to amend it to include findings of fact was denied.

On December 7, 1967, upon plaintiff's motion, an order was entered by Judge James dismissing the application for a receiver and referring the matter for trial setting.

A 2-week jury trial commenced on June 5, 1968 on plaintiff's complaint and defendant's answer and cross complaint. Judge Ward Roney, the trial judge, made two rulings which are defendant's principal assignments of error. First, the stipulation was ruled inadmissible, although oral testimony concerning certain portions of it was allowed. Secondly, by instruction No. 8[4], the court, in effect, instructed the jury that the agency agreement created a debtor-creditor relationship with regard to premiums, whether collected or not. Considerable testimony was presented by both parties concerning their past actions and the accounting procedure with regard to the premiums. That testimony established without substantial dispute that:

(1) Prior to any default in payments required by the agency agreement, defendant had paid plaintiff under the

[4]"You are advised that under the agency agreement entered into by the plaintiff and the defendant, the defendant had the obligation to account to the plaintiff for all policies written by him on the plaintiff by the 15th day of the following month and to pay to the plaintiff the balance therein shown to be due the plaintiff not later than 45 days after the end of the month for which the account was rendered. You are further instructed that each failure, if any, of the defendant to comply with the foregoing constituted a breach of the agreement between the plaintiff and the defendant.

"In your determination of the above, you are entitled to consider any evidence by which the parties mutually agreed, if such be the fact, to alter their respective positions."

45-day provision of subparagraph 3, whether or not he had collected the premiums from subagents.

(2) Defendant, through a personally owned loan company, financed premium payments of numerous insureds, paying plaintiff for policies which he issued. Finance accounts which were uncollected were written off as bad debts on defendant's income tax returns.

(3) Accounts receivable for unpaid premiums were treated by defendant as his own by his act of pledging them as collateral to secure personal loans.

(4) Premiums actually collected were used by defendant on one occasion to pay a tax obligation to the Internal Revenue Service and on another occasion to pay the Indiana Insurance Commissioner a sizeable sum in settlement of a lawsuit commenced against him in Washington by such commissioner.

(5) Both plaintiff and defendant carried these uncollected accounts on their respective books as a debt obligation owing by defendant to the plaintiff.

The defendant's first two assignments of error are directed toward the order entered by Judge Birdseye on December 6, 1967, which released the parties from the stipulation. First, defendant argues that since the stipulation was a binding contract entered into between the parties as a shortcut to a judgment and to prevent the necessity of appointing a receiver, the court had no power to relieve Mr. Patterson of the obligation of auditing, accounting, and attempting to collect the "older accounts." The difficulties and expense encountered by Patterson in performing the stipulation did not warrant relieving plaintiff from its obligations thereunder. The plaintiff had no right to instruct Patterson not to concern himself with the old accounts, and the court had no power to release the parties from their agreement, claims defendant.

■ We do not see how the defendant was prejudiced by the order. If the court had not released the parties from the stipulation, there would still have been a trial involving basically the same issues as did the trial on the merits before

Judge Roney. Also, during the trial the defendant introduced evidence about the old accounts and the fact that Patterson, upon plaintiff's instructions, made no efforts to collect them. Furthermore, it is our view that the stipulation constituted nothing more than a substitute for a court-supervised receivership and was an attempt to settle the litigation by an agreed course of action. The agreement did not purport to alter the basic rights of the parties under the agency contract, which rights were fixed when the lawsuit was commenced.

In his second assignment,[5] defendant asserts that Judge Birdseye should have entered findings of fact and conclusions of law with his order of December 6, 1967. Defendant cites CR 52(a)(5)(B) and CR 41(b)(3) in support of his position. The former provides that findings are not necessary when a decision is made on a motion, and the latter provides that when a court renders judgment on the merits against a plaintiff after the defendant makes a motion to dismiss, the court should make findings. Judge Birdseye refused to enter findings because he did not want to "tie the hands" of the judge who tried the case. The reason defendant wanted findings entered by Judge Birdseye is that he believed such findings would preserve to him the use of the stipulation as evidence at the trial. Judge Birdseye did orally state that the stipulation would probably be admissible in a future trial as evidence of what the parties intended, but his statement was made only in response to defendant's expression of concern that he would not be able to get the stipulation admitted in evidence.[6]

---

[5] "Judge Birdseye erred in refusing to vacate his order of December 6, 1967, when it was not accompanied by any findings of fact despite being based upon a two-day trial, and/or in not amending said order so as to at least preserve to defendant the use of the stipulation as evidence in the later trial."

[6] Defendant was also concerned that Judge Birdseye's order would have a res judicata effect at the trial, which would prevent defendant from litigating the issues of the failure to audit the old accounts and the liability for uncollected premiums. This problem did not arise, and defendant was able to address these issues in the trial.

The findings that defendant wanted made regarding admissibility of the stipulation were actually outside the scope of Judge Birdseye's authority. He could not bind the trial court, which was faced with trying all the issues in the case, by a ruling on the later admissibility of a specific item of evidence. That decision was of necessity left to the trial court. Judge Birdseye's order was limited to ruling that the stipulation was burdensome, that it could not be performed, and that the parties were released from it.[7]

The trial judge did not agree with Judge Birdseye and refused to admit the stipulation (exhibit 42) into evidence, although the court did allow the defendant to testify, over plaintiff's objection, as to his understanding of the import of the stipulation. The stated ground for the exclusion of the stipulation was that it was an attempted compromise of the litigation. In his third assignment of error, defendant claims that the stipulation should have been admitted. He argues that the language in paragraph 2 of the stipulation providing that ascertaining the premiums payable would "necessarily include ascertaining of the premiums receivable from the subagents and the assureds" was directly probative of the central issue in the case.

It is established law that offers of compromise or settlement agreements are not admissible in evidence. *Buob v. Feenaughty Mach. Co.,* 4 Wn.2d 276, 103 P.2d 325 (1940); *Ershig Sheet Metal, Inc. v. General Ins. Co. of America,* 62 Wn.2d 402, 383 P.2d 291 (1963). However, if offers of compromise or settlement agreements contain admissions of distinct fact pertinent to the question in issue, then such admissions are admissible. *Romano Eng'r Corp. v. State,* 8 Wn.2d 670, 113 P.2d 549 (1941); *also see Ershig Sheet Metal, Inc. v. General Ins. Co. of America, supra.* The statement that defendant cites from paragraph 2 of the stipulation falls into the category of an admission of a distinct fact, and it was not stated to be made "hypothetically" or "without

---

[7]Judge Roney was aware of the order entered by Judge Birdseye and gave it its due weight because a copy of the order was furnished to him at the beginning of the jury trial.

prejudice." *Wagner v. Peshastin Lumber Co.,* 149 Wash. 328, 270 P. 1032 (1928). Although it refused to admit the entire stipulation in evidence, the trial court offered the defendant the opportunity to testify as to the terms, which we regard as an admission of fact. Defendant did take advantage of this offer. Testimony was offered as to the import of the provision of paragraph 2 of the stipulation, which went to ascertaining the amounts of premium receivable from subagents and assureds. The trial court, we think adequately resolved the conflict between encouragement of compromise and encouragement of the presentation of documentary evidence, where that is available, by permitting oral testimony about those portions of this stipulation which constituted an admission of fact. We are assuming that the provision in question is relevant to the issue involved and that evidence of the past acts of the parties is admissible in construing the agreement between them.

The central issue of this case is the question of defendant's liability for uncollected and unremitted premiums. A resolution of this question depends on interpretation of the agreement between the parties. The trial court did not think there was any ambiguity in the agreement and refused to give the defendant's proposed instruction No. 5, which instructed the jury that the agreement was ambiguous. Instead, the court gave instruction No. 8, advising the jury, in effect, that defendant was liable for all premiums, whether or not collected from subagents or assureds. The defendant has excepted to the failure of the court to give his instruction No. 5 and to the giving of instruction No. 8.

We think that there was no error in the trial court's action regarding these instructions on ambiguity. This is true even if it is conceded that the written agency agreement in question in this case is less than a model of clarity. Indeed, it is unclear to us that the written agreement even covers the dispute in question here. A frequently announced rule of the Supreme Court allows escape from this difficulty, however.

■ Where the meaning of a written contract is unclear or susceptible to more than one meaning, the subsequent acts of the parties in relation to the agreement may be used as an aid in arriving at the meaning intended by the parties. *Boeing Airplane Co. v. Firemen's Fund Indem. Co.*, 44 Wn.2d 488, 268 P.2d 654, 45 A.L.R.2d 984 (1954); *Schauerman v. Haag*, 68 Wn.2d 868, 416 P.2d 88 (1966); *Bremerton v. Kitsap County Sewer Dist.*, 71 Wn.2d 689, 430 P.2d 956 (1967); *Ramsey v. Sedlar*, 75 Wn.2d 901, 454 P.2d 416 (1969); *Jacoby v. Grays Harbor Chair & Mfg. Co.*, 77 Wn.2d 911, 468 P.2d 666 (1970). As the Supreme Court said in *Burch v. Rice*, 37 Wn.2d 185, 190, 222 P.2d 847 (1950), quoting *In re Estate of Garrity*, 22 Wn.2d 391, 398, 156 P.2d 217 (1945):

> "In ascertaining the intention of parties to a written agreement, we must look to the wording of the instrument itself as made by the parties, view it as a whole, and consider all of the circumstances surrounding the transaction including the subject matter together with the subsequent acts of the parties to the instrument. Courts will give to words in a contract the ordinary or common meaning. A liberal construction will be given to contracts in order that they may be given effect and to carry out the intention reflected therein. [Citing cases.]"

In reading these words often cited by the Supreme Court, we remember Professor John H. Wigmore's statement of the general nature of interpretation:

> The process of Interpretation is a part of the procedure of *realizing a person's act in the external world*. It is, in a sense, the completion of the act; for without it the utterance, whether written or oral, must remain vain words.

9 J. Wigmore, Evidence § 2458 (1940).

Of course, in a situation of contract, our concern is with bilateral intent. That is, the intent to be ascertained is the mutually agreed intent of the parties. In ascertaining this intent, objectively manifested actions must speak to the exclusion of oral statements unless such oral statements clearly show themselves to be bilateral ones. Acts of the parties prior to and contemporaneous with the agreement and the parties' course of conduct subsequent to the agree-

ment provide good proofs of the parties' intentions as to the sense of the words they used.

In making this last statement, we are well aware that there is an apparent conflict in the law of contract interpretation. On the one hand there is a desire (bottomed in the questionable belief that words have but a single meaning) to enforce written agreements—to protect the integrity of writings and the undertakings supposedly embodied therein. On the other hand stands the demonstrable fact that words do not have a single meaning and so if the sense of the words the parties used in contracting is to be found, proof of the context in which the words were used is needed. From these conflicting desires arose two lines of apparently conflicting case authority. *Compare Dennis v. Southworth,* 2 Wn. App. 115, 467 P.2d 330 (1970) (dictum) *with Beedle v. General Inv. Co.,* 2 Wn. App. 594, 469 P.2d 233 (1970). *See* 5 R. Meisenholder, Wash. Prac. § 121 (1965). *Also compare Poggi v. Tool Research & Eng'r Corp.,* 75 Wn.2d 356, 451 P.2d 296 (1969) *with Clements v. Olsen,* 46 Wn.2d 445, 282 P.2d 266 (1955), *and Bremerton v. Kitsap County Sewer Dist.,* 71 Wn.2d 689, 430 P.2d 956 (1967).

We use the words "apparent conflict" because we wish to propose possible reconciliation of the difficulties found in this corner of contract law. The older plain meaning rule, in its pure state, is a holdover from an earlier age in which words were endowed with a sort of magic, an immutable single meaning. Such a pure form of this rule is not found, however. In tacit admission of the inadequacy of the plain meaning rule, courts came to consider evidence of the context of an agreement in interpreting it when they found the agreement to be "ambiguous" or "susceptible to more than one meaning." This provided a means for the court at times to mechanically rationalize results without the need for discussion of why the agreement in question was "ambiguous" or was "susceptible to more than one meaning."

The context rule, which allows admission of prior, contemporaneous and (under the rubric practical construc-

tion) subsequent conduct of the parties, while it has some difficulties associated with it, also has some clear benefits over the older rule. As a matter of evidentiary procedure, which is actually a problem separate from that under discussion, consideration of the reliability of proof offered to show the context of the agreement must be given. Since this evidentiary problem is one separate from that which we must reach here, we only mention it without offering, for the present, a resolution of it. *See Barber v. Rochester,* 52 Wn.2d 691, 328 P.2d 711 (1958) *and Green River Valley Foundation, Inc. v. Foster,* 78 W.D.2d 245, 473 P.2d 844 (1970) (concurring opinion of Finley, J.).

In the matter of interpretation of contracts, a context rule may make it more difficult to reach desirable results, since the old mechanistic formula is unavailable as a substitute for analysis of factual evidence. However, these difficulties seem to us to be clearly outweighed by the benefits to be derived from frank admission that the court will consider context evidence in interpretation.

The first of these benefits is found in promotion of clarity in the decision-making process. No longer will resort be had to a standard as vague and undefined as "ambiguous or susceptible to more than one meaning." With improved exposition of the decision-making process will come an evolution of standards involving what sorts of evidence will be more or less convincing in determination of the correct meaning of words. This, in turn, will lead to promotion of true clarity of reasoning which will be of more aid to the practicing bar than is the present false certainty of a mechanical rule.

This leads us to our central point, which is that the older plain meaning rule effectively does the same thing as the context rule *(see generally Green River Valley Foundation, Inc. v. Foster, supra)*, but it does it in a way which is unfortunately apt to lead to imprecision. If a context rule is applied, there will be no effective loss in the certainty of writings, since it is submitted that the plain meaning rule is used only where there is no difference over the sense of

the words anyway. Where this is so, evidence on the context in which the words were used would produce the same result as a reading of the face of the writing. Where it is not so, the plain meaning rule either gives way to its exception, which allows the consideration of context evidence or it stands as a mechanically applied bar to the most relevant obtainable evidence of the sense of the words which the parties desired to employ. Thus, we would suggest that since the effective result is the same, the law would be well served by adoption of a rule which makes plain what is in fact being done when a contract is interpreted. 34 Wash. L. Rev. 345 (1959); 3 A. Corbin, Contracts § 536 (1960); 4 S. Williston, Contracts §§ 609, 618, 629 (3d ed. 1961); Restatement Contracts § 230 (1932).

Whether this suggestion is followed and the context rule is applied or the exception to the plain meaning rule cited above is used, the result in the case at bar is the same. The trial court was correct in its finding that there was no ambiguity in the agency agreement before us in this case. Though the phrasing employed by the parties was inartful, the *uncontradicted* evidence in this case is sufficient to demonstrate the correctness of the trial court's instructions that the agreement of the parties was unambiguous.

The evidence established that it was the accounting practice of both parties uniformly to include the entire amount of the premium, collected or not, as the amount owing from defendant to plaintiff. Albright was billed for the total amount of premium due on the insurance he placed. He paid this amount whether he collected from his subagents or assureds or not until the time when his business suffered such reverses that he was no longer able to do so. In fact, defendant paid more premium to plaintiff than he collected. This was true at least in the years before he developed financial problems and used premium funds to pay off settlements with the Internal Revenue Service and the Indiana Insurance Commission and used accounts receivable to secure personal loans. At any rate, throughout the term of the agreement, defendant wrote off uncollected

premium obligations as bad debts on his income tax returns.

These facts convince us that we must agree with the trial court that *when* the dispute arose, there was no ambiguity in the agreement of the parties. A debtor-creditor relationship had clearly been established and the parties had acted consistently with their obligations thereunder until one of them, the debtor, had experienced such financial difficulties that he began making unauthorized use of collected premiums in his possession, in an attempt to save himself from his peril. The fact that a debtor misuses funds does not make him less a debtor. The relationship was established unambiguously by an agreement and a practical construction thereof. Later misdeeds cannot serve to alter this contract any more than can unilateral declarations of intent alter expressed bilateral intent. *See* 9 J. Wigmore, Evidence § 2466 (1940).

■ In addition to the exception taken to instruction No. 8, defendant has also excepted to the giving of instruction No. 7-B[8] and 9[9]. We find no merit in his arguments that they were improper and prejudicial instructions. The

---

[8]Instruction 7-B reads as follows:

"It is an implied condition of every contract that one party will not prevent performance by the other party, and it follows that a contracting party who prevents the other party from performing under the contract cannot urge or avail himself of the nonperformance which he himself has brought about.

"The plaintiff would not, however, be responsible for the separate or independent acts of the State Insurance Commissioner, if any, or the damage flowing therefrom."

[9]"You are advised that the plaintiff entered into a contract with the defendant which made the defendant the agent of the plaintiff for the purpose of marketing plaintiff's insurance. If you find that the contract between the parties allows either party to cancel the contract on written notice to the other, then you must find for the plaintiff in the amount, if any, the credible evidence shows the defendant owes to the plaintiff, unless you further find that the plaintiff wrongfully cancelled defendant's agency agreement. Then, the damage, if any, caused by the cancellation of the agency should be deducted from the premiums owing plaintiff, if any, or the premiums owing to plaintiff, if any, should be deducted from the amount awarded cross-complainant, if any, on his cross-complaint."

ground stated for the exception to instruction 7-B was that it was a comment on the evidence. Informing the jury of the legal significance of an item of evidence (if proved) does not constitute a comment on the evidence.

The defendant excepted to and assigns error to the trial court's refusal to give a proposed instruction on accord and satisfaction[10] and two proposed instructions concerning "agent."[11]

■ We think the trial court was correct in refusing to give the proposed instruction on accord and satisfaction. Accord and satisfaction is based upon the law of contract. *Teel v. Cascade-Olympic Constr. Co.*, 68 Wn.2d 718, 415 P.2d 73 (1966). For an accord and satisfaction to be binding and thus discharge the earlier obligation, there must be a bona fide dispute, an agreement to settle that dispute, and then performance of that agreement. *Boyd-Conlee Co. v. Gillingham*, 44 Wn.2d 152, 266 P.2d 339 (1954); *Dodd v.*

---

[10]"There is in the law what is known as 'accord and satisfaction.' Under this concept of the law, where one party claims, and the other party disputes, an amount owing, and the circumstances are such that it is not mathematically practicable to ascertain a substantially accurate and certain amount, or where the parties are in a bonafide dispute as to how the amount should be ascertained, if the person to whom the money is owing agrees to accept less than the amount actually due and owing in full satisfaction of the obligation at that time existing and such amount is actually paid by the other party, then, the party accepting such payment is barred from thereafter collecting any part of the obligation which may subsequently be shown to have existed when such accord and satisfaction was made."

[11]The first of these proposed instructions reads:

"The laws of the State of Washington define 'agent' as follows:

" ' . . . (A)ny person appointed by an insurer to submit applications for insurance on its behalf, and if authorized so to do, to effectuate and countersign insurance contracts, . . . and to collect premiums on insurance so applied for or effectuated.' "

The second proposed instruction reads:

"It is admitted by the parties that the relationship of principal and agent existed between them by virtue of their agency agreement.

"Ordinarily in such a relationship, the agent does not become a debtor to his principal for the cost of such articles as may be the subject of the agency but, instead, he is said to be under a duty to account for and to deliver to his principal, such funds as actually come into his hands in the course of conducting the principal's business."

*Polack,* 63 Wn.2d 828, 389 P.2d 289 (1964). In this case, the evidence is not sufficient to support a finding of an agreement to compromise the indebtedness. At most, it would seem plaintiff agreed to advance defendant operating capital if defendant would make a partial payment on its account with plaintiff. No more merit is found in the claimed error resulting from failure to give defendant's proposed instructions defining "agent."

The court rejected the two instructions on "agent" because it believed the agency contract controlled the relationship between the parties, rather than the statutory definition of the word "agent" or the traditional incidents of the relationship of principal and agent. We agree with these reasons for rejecting the proffered instructions. The second instruction, moreover, is probably a comment on the evidence.

Near the conclusion of the trial, Mr. Frederick Paul, one of the attorneys for the plaintiff, was permitted to testify over the defendant's objection. Mr. Paul's testimony went primarily to the matters raised by the defendant's cross complaint on wrongful attachment. The cross complaint was filed on June 14, 1967, after the commencement of the action and after Mr. Paul had participated in the case. Mr. Paul did not participate in the conduct of the trial, except that he did sit at the counsel table beside the attorney who tried the plaintiff's case, and the two exchanged whispered comments during the trial. He did not argue the case to the jury, conduct any examination of witnesses, or make any argument or objection to the court in the presence of the jury. Mr. Paul did participate in the colloquy concerning the proposed jury instructions.

CR 43 (g) prohibits an attorney who gives evidence on the merits of his client's case from arguing the case to the jury, unless the court permits. CPE 19 provides that an attorney should avoid testifying in court on behalf of his client "Except when essential to the ends of justice . . ." The canon also is similar to CR 43 (g) in that it exhorts an attor-

ney to leave the trial of the case to another when he testifies as to the merits of his client's case.

■ The trial court stated that plaintiff's attorney, Mr. Peterson, had earlier announced that he proposed to call Mr. Paul upon the wrongful attachment phase of the case, since he had been intimately involved with the attachment proceedings. Mr. Paul's testimony was the principal evidence given in opposition to the cross complaint for wrongful attachment, and in the absence of other witnesses who could give evidence of this nature, his testimony was obviously necessary "to the ends of justice." We see no abuse of discretion in permitting Mr. Paul to testify. *Ryan v. Ryan,* 48 Wn.2d 593, 295 P.2d 1111 (1956); *State v. Fackrell,* 44 Wn.2d 874, 271 P.2d 679 (1954). The various objections raised by defendant to Mr. Paul's testimony go to its credibility, rather than its admissibility. *See Lau Ah Yew v. Dulles,* 257 F.2d 744 (9th Cir. 1958).

We see no merit in defendant's assignment of error 11 that the trial court erred in failing to dismiss the complaint for insufficiency of the evidence.

Judgment affirmed.

ARMSTRONG, C. J., and PETRIE, J., concur.

Petition for rehearing denied October 14, 1970.

Review denied by Supreme Court November 25, 1970.